# GERTZ *v.* ROBERT WELCH, Inc.

No. 72–617.   Argued November 14, 1973—Decided June 25, 1974

324

*Wayne B. Giampietro* argued the cause and filed briefs for petitioner.

*Clyde J. Watts* argued the cause and filed a brief for respondent.

MR. JUSTICE POWELL delivered the opinion of the Court.

This Court has struggled for nearly a decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment. With this decision we return to that effort. We granted certiorari to reconsider the extent of a publisher's constitutional privilege against liability for defamation of a private citizen. 410 U. S. 925 (1973).

I

In 1968 a Chicago policeman named Nuccio shot and killed a youth named Nelson. The state authorities prosecuted Nuccio for the homicide and ultimately obtained a conviction for murder in the second degree. The Nelson family retained petitioner Elmer Gertz, a reputable attorney, to represent them in civil litigation against Nuccio.

Respondent publishes American Opinion, a monthly outlet for the views of the John Birch Society. Early in the 1960's the magazine began to warn of a nationwide conspiracy to discredit local law enforcement agencies and create in their stead a national police force capable of supporting a Communist dictatorship. As part of the continuing effort to alert the public to this assumed danger, the managing editor of American Opinion commissioned an article on the murder trial of Officer Nuccio. For this purpose he engaged a regular contributor to the magazine. In March 1969 respondent published the resulting article under the title "FRAME-UP: Richard

Nuccio And The War On Police." The article purports to demonstrate that the testimony against Nuccio at his criminal trial was false and that his prosecution was part of the Communist campaign against the police.

In his capacity as counsel for the Nelson family in the civil litigation, petitioner attended the coroner's inquest into the boy's death and initiated actions for damages, but he neither discussed Officer Nuccio with the press nor played any part in the criminal proceeding. Notwithstanding petitioner's remote connection with the prosecution of Nuccio, respondent's magazine portrayed him as an architect of the "frame-up." According to the article, the police file on petitioner took "a big, Irish cop to lift." The article stated that petitioner had been an official of the "Marxist League for Industrial Democracy, originally known as the Intercollegiate Socialist Society, which has advocated the violent seizure of our government." It labeled Gertz a "Leninist" and a "Communist-fronter." It also stated that Gertz had been an officer of the National Lawyers Guild, described as a Communist organization that "probably did more than any other outfit to plan the Communist attack on the Chicago police during the 1968 Democratic Convention."

These statements contained serious inaccuracies. The implication that petitioner had a criminal record was false. Petitioner had been a member and officer of the National Lawyers Guild some 15 years earlier, but there was no evidence that he or that organization had taken any part in planning the 1968 demonstrations in Chicago. There was also no basis for the charge that petitioner was a "Leninist" or a "Communist-fronter." And he had never been a member of the "Marxist League for Industrial Democracy" or the "Intercollegiate Socialist Society."

The managing editor of American Opinion made no effort to verify or substantiate the charges against petitioner. Instead, he appended an editorial introduction stating that the author had "conducted extensive research into the Richard Nuccio Case." And he included in the article a photograph of petitioner and wrote the caption that appeared under it: "Elmer Gertz of Red Guild harrasses Nuccio." Respondent placed the issue of American Opinion containing the article on sale at newsstands throughout the country and distributed reprints of the article on the streets of Chicago.

Petitioner filed a diversity action for libel in the United States District Court for the Northern District of Illinois. He claimed that the falsehoods published by respondent injured his reputation as a lawyer and a citizen. Before filing an answer, respondent moved to dismiss the complaint for failure to state a claim upon which relief could be granted, apparently on the ground that petitioner failed to allege special damages. But the court ruled that statements contained in the article constituted libel *per se* under Illinois law and that consequently petitioner need not plead special damages. 306 F. Supp. 310 (1969).

After answering the complaint, respondent filed a pretrial motion for summary judgment, claiming a constitutional privilege against liability for defamation.[1] It asserted that petitioner was a public official or a public figure and that the article concerned an issue of public interest and concern. For these reasons, respondent argued, it was entitled to invoke the privilege enunciated in *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964). Under this rule respondent would escape liability unless

---

[1] Petitioner filed a cross-motion for summary judgment on grounds not specified in the record. The court denied petitioner's cross-motion without discussion in a memorandum opinion of September 16, 1970.

petitioner could prove publication of defamatory falsehood "with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 280. Respondent claimed that petitioner could not make such a showing and submitted a supporting affidavit by the magazine's managing editor. The editor denied any knowledge of the falsity of the statements concerning petitioner and stated that he had relied on the author's reputation and on his prior experience with the accuracy and authenticity of the author's contributions to American Opinion.

The District Court denied respondent's motion for summary judgment in a memorandum opinion of September 16, 1970. The court did not dispute respondent's claim to the protection of the *New York Times* standard. Rather, it concluded that petitioner might overcome the constitutional privilege by making a factual showing sufficient to prove publication of defamatory falsehood in reckless disregard of the truth. During the course of the trial, however, it became clear that the trial court had not accepted all of respondent's asserted grounds for applying the *New York Times* rule to this case. It thought that respondent's claim to the protection of the constitutional privilege depended on the contention that petitioner was either a public official under the *New York Times* decision or a public figure under *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967), apparently discounting the argument that a privilege would arise from the presence of a public issue. After all the evidence had been presented but before submission of the case to the jury, the court ruled in effect that petitioner was neither a public official nor a public figure. It added that, if he were, the resulting application of the *New York Times* standard would require a directed verdict for respondent. Because some statements in the article constituted libel *per se*

under Illinois law, the court submitted the case to the jury under instructions that withdrew from its consideration all issues save the measure of damages. The jury awarded $50,000 to petitioner.

Following the jury verdict and on further reflection, the District Court concluded that the *New York Times* standard should govern this case even though petitioner was not a public official or public figure. It accepted respondent's contention that that privilege protected discussion of any public issue without regard to the status of a person defamed therein. Accordingly, the court entered judgment for respondent notwithstanding the jury's verdict.[2] This conclusion anticipated the reason-

---

[2] 322 F. Supp. 997 (1970). Petitioner asserts that the entry of judgment *n. o. v.* on the basis of his failure to show knowledge of falsity or reckless disregard for the truth constituted unfair surprise and deprived him of a full and fair opportunity to prove "actual malice" on the part of respondent. This contention is not supported by the record. It is clear that the trial court gave petitioner no reason to assume that the *New York Times* privilege would not be available to respondent. The court's memorandum opinion denying respondent's pretrial motion for summary judgment does not state that the *New York Times* standard was inapplicable to this case. Rather, it reveals that the trial judge thought it possible for petitioner to make a factual showing sufficient to overcome respondent's claim of constitutional privilege. It states in part:

"When there is a factual dispute as to the existence of actual malice, summary judgment is improper.

. . . . .

"In the instant case a jury might infer from the evidence that [respondent's] failure to investigate the truth of the allegations, coupled with its receipt of communications challenging the factual accuracy of this author in the past, amounted to actual malice, that is, 'reckless disregard' of whether the allegations were true or not. *New York Times [Co.]* v. *Sullivan,* [376 U. S. 254,] 279–280 [(1964)]." Mem. Op., Sept. 16, 1970.

Thus, petitioner knew or should have known that the outcome of the trial might hinge on his ability to show by clear and convincing

ing of a plurality of this Court in *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971).

Petitioner appealed to contest the applicability of the *New York Times* standard to this case. Although the Court of Appeals for the Seventh Circuit doubted the correctness of the District Court's determination that petitioner was not a public figure, it did not overturn that finding.[3] It agreed with the District Court that respondent could assert the constitutional privilege because the article concerned a matter of public interest, citing this Court's intervening decision in *Rosenbloom* v. *Metromedia, Inc., supra.* The Court of Appeals read *Rosenbloom* to require application of the *New York Times* standard to any publication or broadcast about an issue of significant public interest, without regard to the position, fame, or anonymity of the person defamed, and it concluded that respondent's statements

---

evidence that respondent acted with reckless disregard for the truth. And this question remained open throughout the trial. Although the court initially concluded that the applicability of the *New York Times* rule depended on petitioner's status as a public figure, the court did not decide that petitioner was not a public figure until all the evidence had been presented. Thus petitioner had every opportunity, indeed incentive, to prove "reckless disregard" if he could, and he in fact attempted to do so. The record supports the observation by the Court of Appeals that petitioner "did present evidence of malice (both the 'constitutional' and the 'ill will' type) to support his damage claim and no such evidence was excluded . . . ." 471 F. 2d 801, 807 n. 15 (1972).

[3] The court stated:

"[Petitioner's] considerable stature as a lawyer, author, lecturer, and participant in matters of public import undermine[s] the validity of the assumption that he is not a 'public figure' as that term has been used by the progeny of *New York Times*. Nevertheless, for purposes of decision we make that assumption and test the availability of the claim of privilege by the subject matter of the article." *Id.*, at 805.

concerned such an issue.[4]   After reviewing the record, the Court of Appeals endorsed the District Court's conclusion that petitioner had failed to show by clear and

---

[4] In the Court of Appeals petitioner made an ingenious but unavailing attempt to show that respondent's defamatory charge against him concerned no issue of public or general interest.  He asserted that the subject matter of the article was the murder trial of Officer Nuccio and that he did not participate in that proceeding.  Therefore, he argued, even if the subject matter of the article generally were protected by the *New York Times* privilege, under the opinion of the *Rosenbloom* plurality, the defamatory statements about him were not.  The Court of Appeals rejected this argument.  It noted that the accusations against petitioner played an integral part in respondent's general thesis of a nationwide conspiracy to harass the police:

"[W]e may also assume that the article's basic thesis is false.   Nevertheless, under the reasoning of New York Times Co. v. Sullivan, even a false statement of fact made in support of a false thesis is protected unless made with knowledge of its falsity or with reckless disregard of its truth or falsity.   It would undermine the rule of that case to permit the actual falsity of a statement to determine whether or not its publisher is entitled to the benefit of the rule.

"If, therefore, we put to one side the false character of the article and treat it as though its contents were entirely true, it cannot be denied that the comments about [petitioner] were integral to its central thesis.   They must be tested under the *New York Times* standard."   471 F. 2d, at 806.

We think that the Court of Appeals correctly rejected petitioner's argument.  Its acceptance might lead to arbitrary imposition of liability on the basis of an unwise differentiation among kinds of factual misstatements.  The present case illustrates the point.  Respondent falsely portrayed petitioner as an architect of the criminal prosecution against Nuccio.  On its face this inaccuracy does not appear defamatory.  Respondent also falsely labeled petitioner a "Leninist" and a "Communist-fronter."  These accusations are generally considered defamatory.  Under petitioner's interpretation of the "public or general interest" test, respondent would have enjoyed a constitutional privilege to publish defamatory falsehood if petitioner had in fact been associated with the criminal prosecution.  But this would mean that the seemingly innocuous mistake of con-

convincing evidence that respondent had acted with "actual malice" as defined by *New York Times*. There was no evidence that the managing editor of American Opinion knew of the falsity of the accusations made in the article. In fact, he knew nothing about petitioner except what he learned from the article. The court correctly noted that mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth. Rather, the publisher must act with a " 'high degree of awareness of . . . probable falsity.' " *St. Amant* v. *Thompson*, 390 U. S. 727, 731 (1968); accord, *Beckley Newspapers Corp.* v. *Hanks*, 389 U. S. 81, 84–85 (1967); *Garrison* v. *Louisiana*, 379 U. S. 64, 75–76 (1964). The evidence in this case did not reveal that respondent had cause for such an awareness. The Court of Appeals therefore affirmed, 471 F. 2d 801 (1972). For the reasons stated below, we reverse.

## II

The principal issue in this case is whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements. The Court considered this question on the rather different set of facts presented in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971). Rosenbloom, a distributor of nudist magazines, was arrested for selling allegedly obscene material while mak-

---

fusing petitioner's role in the litigation against Officer Nuccio would destroy the privilege otherwise available for calling petitioner a Communist-fronter. Thus respondent's privilege to publish statements whose content should have alerted it to the danger of injury to reputation would hinge on the accuracy of statements that carried with them no such warning. Assuming that none of these statements was published with knowledge of falsity or with reckless disregard for the truth, we see no reason to distinguish among the inaccuracies.

ing a delivery to a retail dealer. The police obtained a warrant and seized his entire inventory of 3,000 books and magazines. He sought and obtained an injunction prohibiting further police interference with his business. He then sued a local radio station for failing to note in two of its newscasts that the 3,000 items seized were only "reportedly" or "allegedly" obscene and for broadcasting references to "the smut literature racket" and to "girliebook peddlers" in its coverage of the court proceeding for injunctive relief. He obtained a judgment against the radio station, but the Court of Appeals for the Third Circuit held the *New York Times* privilege applicable to the broadcast and reversed. 415 F. 2d 892 (1969).

This Court affirmed the decision below, but no majority could agree on a controlling rationale. The eight Justices [5] who participated in *Rosenbloom* announced their views in five separate opinions, none of which commanded more than three votes. The several statements not only reveal disagreement about the appropriate result in that case, they also reflect divergent traditions of thought about the general problem of reconciling the law of defamation with the First Amendment. One approach has been to extend the *New York Times* test to an expanding variety of situations. Another has been to vary the level of constitutional privilege for defamatory falsehood with the status of the person defamed. And a third view would grant to the press and broadcast media absolute immunity from liability for defamation. To place our holding in the proper context, we preface our discussion of this case with a review of the several *Rosenbloom* opinions and their antecedents.

In affirming the trial court's judgment in the instant case, the Court of Appeals relied on MR. JUSTICE BREN-

---

[5] MR. JUSTICE DOUGLAS did not partcipate in the consideration or decision of *Rosenbloom*.

NAN's conclusion for the *Rosenbloom* plurality that "all discussion and communication involving matters of public or general concern," 403 U. S., at 44, warrant the protection from liability for defamation accorded by the rule originally enunciated in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964). There this Court defined a constitutional privilege intended to free criticism of public officials from the restraints imposed by the common law of defamation. The Times ran a political advertisement endorsing civil rights demonstrations by black students in Alabama and impliedly condemning the performance of local law-enforcement officials. A police commissioner established in state court that certain misstatements in the advertisement referred to him and that they constituted libel *per se* under Alabama law. This showing left the Times with the single defense of truth, for under Alabama law neither good faith nor reasonable care would protect the newspaper from liability. This Court concluded that a "rule compelling the critic of official conduct to guarantee the truth of all his factual assertions" would deter protected speech, *id.,* at 279, and announced the constitutional privilege designed to counter that effect:

> "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.,* at 279–280.[6]

---

[6] *New York Times* and later cases explicated the meaning of the new standard. In *New York Times* the Court held that under the circumstances the newspaper's failure to check the accuracy of the advertisement against news stories in its own files did not establish

Three years after *New York Times,* a majority of the Court agreed to extend the constitutional privilege to defamatory criticism of "public figures." This extension

reckless disregard for the truth. 376 U. S., at 287–288. In *St. Amant* v. *Thompson,* 390 U. S. 727, 731 (1968), the Court equated reckless disregard of the truth with subjective awareness of probable falsity: "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." In *Beckley Newspapers Corp.* v. *Hanks,* 389 U. S. 81 (1967), the Court emphasized the distinction between the *New York Times* test of knowledge of falsity or reckless disregard of the truth and "actual malice" in the traditional sense of ill-will. *Garrison* v. *Louisiana,* 379 U. S. 64 (1964), made plain that the new standard applied to criminal libel laws as well as to civil actions and that it governed criticism directed at "anything which might touch on an official's fitness for office." *Id.,* at 77. Finally, in *Rosenblatt* v. *Baer,* 383 U. S. 75, 85 (1966), the Court stated that "the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."

In *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967), the Court applied the *New York Times* standard to actions under an unusual state statute. The statute did not create a cause of action for libel. Rather, it provided a remedy for unwanted publicity. Although the law allowed recovery of damages for harm caused by exposure to public attention rather than by factual inaccuracies, it recognized truth as a complete defense. Thus, nondefamatory factual errors could render a publisher liable for something akin to invasion of privacy. The Court ruled that the defendant in such an action could invoke the *New York Times* privilege regardless of the fame or anonymity of the plaintiff. Speaking for the Court, MR. JUSTICE BRENNAN declared that this holding was not an extension of *New York Times* but rather a parallel line of reasoning applying that standard to this discrete context:

"This is neither a libel action by a private individual nor a statutory action by a public official. Therefore, although the First Amendment principles pronounced in *New York Times* guide our conclusion, we reach that conclusion only by applying these principles in this discrete context. It therefore serves no purpose to distinguish the facts here from those in *New York Times.* Were this a libel action, the distinction which has been suggested be-

was announced in *Curtis Publishing Co.* v. *Butts* and its companion, *Associated Press* v. *Walker,* 388 U. S. 130, 162 (1967). The first case involved the Saturday Evening Post's charge that Coach Wally Butts of the University of Georgia had conspired with Coach "Bear" Bryant of the University of Alabama to fix a football game between their respective schools. *Walker* involved an erroneous Associated Press account of former Major General Edwin Walker's participation in a University of Mississippi campus riot. Because Butts was paid by a private alumni association and Walker had resigned from the Army, neither could be classified as a "public official" under *New York Times.* Although Mr. Justice Harlan announced the result in both cases, a majority of the Court agreed with Mr. Chief Justice Warren's conclusion that the *New York Times* test should apply to criticism of "public figures" as well as "public officials." [7] The Court extended the con-

---

tween the relative opportunities of the public official and the private individual to rebut defamatory charges might be germane. And the additional state interest in the protection of the individual against damage to his reputation would be involved. Cf. *Rosenblatt* v. *Baer,* 383 U. S. 75, 91 (STEWART, J., concurring)." 385 U. S., at 390–391.

[7] Professor Kalven once introduced a discussion of these cases with the apt heading, "You Can't Tell the Players without a Score Card." Kalven, The Reasonable Man and the First Amendment: Hill, Butts, and Walker, 1967 Sup. Ct. Rev. 267, 275. Only three other Justices joined Mr. Justice Harlan's analysis of the issues involved. In his concurring opinion, Mr. Chief Justice Warren stated the principle for which these cases stand—that the *New York Times* test reaches both public figures and public officials. MR. JUSTICE BRENNAN and MR. JUSTICE WHITE agreed with the Chief Justice on that question. Mr. Justice Black and MR. JUSTICE DOUGLAS reiterated their view that publishers should have an absolute immunity from liability for defamation, but they acquiesced in the Chief Justice's reasoning in order to enable a majority of the Justices to agree on the question of the appropriate constitutional privilege for defamation of public figures.

stitutional privilege announced in that case to protect defamatory criticism of nonpublic persons who "are nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id.*, at 164 (Warren, C. J., concurring in result).

In his opinion for the plurality in *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971), MR. JUSTICE BRENNAN took the *New York Times* privilege one step further. He concluded that its protection should extend to defamatory falsehoods relating to private persons if the statements concerned matters of general or public interest. He abjured the suggested distinction between public officials and public figures on the one hand and private individuals on the other. He focused instead on society's interest in learning about certain issues: "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved." *Id.*, at 43. Thus, under the plurality opinion, a private citizen involuntarily associated with a matter of general interest has no recourse for injury to his reputation unless he can satisfy the demanding requirements of the *New York Times* test.

Two Members of the Court concurred in the result in *Rosenbloom* but departed from the reasoning of the plurality. Mr. Justice Black restated his view, long shared by MR. JUSTICE DOUGLAS, that the First Amendment cloaks the news media with an absolute and indefeasible immunity from liability for defamation. *Id.*, at 57. MR JUSTICE WHITE concurred on a narrower ground. *Ibid.* He concluded that "the First Amendment gives the press and the broadcast media a privilege to report and comment upon the official actions of public

servants in full detail, with no requirement that the reputation or the privacy of an individual involved in or affected by the official action be spared from public view." *Id.*, at 62. He therefore declined to reach the broader questions addressed by the other Justices.

Mr. Justice Harlan dissented. Although he had joined the opinion of the Court in *New York Times,* in *Curtis Publishing Co.* he had contested the extension of the privilege to public figures. There he had argued that a public figure who held no governmental office should be allowed to recover damages for defamation "on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." 388 U. S., at 155. In his *Curtis Publishing Co.* opinion Mr. Justice Harlan had distinguished *New York Times* primarily on the ground that defamation actions by public officials "lay close to seditious libel . . . ." *Id.*, at 153. Recovery of damages by one who held no public office, however, could not "be viewed as a vindication of governmental policy." *Id.*, at 154. Additionally, he had intimated that, because most public officials enjoyed absolute immunity from liability for their own defamatory utterances under *Barr v. Matteo*, 360 U. S. 564 (1959), they lacked a strong claim to the protection of the courts.

In *Rosenbloom* Mr. Justice Harlan modified these views. He acquiesced in the application of the privilege to defamation of public figures but argued that a different rule should obtain where defamatory falsehood harmed a private individual. He noted that a private person has less likelihood "of securing access to channels of communication sufficient to rebut falsehoods concerning him" than do public officials and public figures, 403 U. S., at 70, and has not voluntarily placed himself in the

public spotlight. Mr. Justice Harlan concluded that the States could constitutionally allow private individuals to recover damages for defamation on the basis of any standard of care except liability without fault.

MR. JUSTICE MARSHALL dissented in *Rosenbloom* in an opinion joined by MR. JUSTICE STEWART. *Id.*, at 78. He thought that the plurality's "public or general interest" test for determining the applicability of the *New York Times* privilege would involve the courts in the dangerous business of deciding "what information is relevant to self-government." *Id.*, at 79. He also contended that the plurality's position inadequately served "society's interest in protecting private individuals from being thrust into the public eye by the distorting light of defamation." *Ibid.* MR. JUSTICE MARSHALL therefore reached the conclusion, also reached by Mr. Justice Harlan, that the States should be "essentially free to continue the evolution of the common law of defamation and to articulate whatever fault standard best suits the State's need," so long as the States did not impose liability without fault. *Id.*, at 86. The principal point of disagreement among the three dissenters concerned punitive damages. Whereas Mr. Justice Harlan thought that the States could allow punitive damages in amounts bearing "a reasonable and purposeful relationship to the actual harm done . . . ," *id.*, at 75, MR. JUSTICE MARSHALL concluded that the size and unpredictability of jury awards of exemplary damages unnecessarily exacerbated the problems of media self-censorship and that such damages should therefore be forbidden.

III

We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but

on the competition of other ideas.[8]  But there is no con-
stitutional value in false statements of fact.  Neither
the intentional lie nor the careless error materially ad-
vances society's interest in "uninhibited, robust, and
wide-open" debate on public issues.  *New York Times
Co.* v. *Sullivan,* 376 U. S., at 270.  They belong to that
category of utterances which "are no essential part of
any exposition of ideas, and are of such slight social value
as a step to truth that any benefit that may be derived
from them is clearly outweighed by the social interest
in order and morality."  *Chaplinsky* v. *New Hampshire,*
315 U. S. 568, 572 (1942).

Although the erroneous statement of fact is not worthy
of constitutional protection, it is nevertheless inevitable in
free debate.  As James Madison pointed out in the Report
on the Virginia Resolutions of 1798: "Some degree of
abuse is inseparable from the proper use of every thing;
and in no instance is this more true than in that of the
press."  4 J. Elliot, Debates on the Federal Constitution
of 1787, p. 571 (1876).  And punishment of error runs the
risk of inducing a cautious and restrictive exercise of the
constitutionally guaranteed freedoms of speech and press.
Our decisions recognize that a rule of strict liability that
compels a publisher or broadcaster to guarantee the ac-
curacy of his factual assertions may lead to intolerable
self-censorship.  Allowing the media to avoid liability
only by proving the truth of all injurious statements does
not accord adequate protection to First Amendment liber-
ties.  As the Court stated in *New York Times Co.* v. *Sul-
livan, supra,* at 279: "Allowance of the defense of truth,

---

[8] As Thomas Jefferson made the point in his first Inaugural
Address: "If there be any among us who would wish to dissolve this
Union or change its republican form, let them stand undisturbed
as monuments of the safety with which error of opinion may be
tolerated where reason is left free to combat it."

with the burden of proving it on the defendant, does not mean that only false speech will be deterred." The First Amendment requires that we ·protect some falsehood in order to protect speech that matters.

The need to avoid self-censorship by the news media is, however, not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation. See *New York Times Co.* v. *Sullivan, supra,* at 293 (Black, J., concurring); *Garrison* v. *Louisiana,* 379 U. S., at 80 (DOUGLAS, J., concurring); *Curtis Publishing Co.* v. *Butts,* 388 U. S., at 170 (opinion of Black, J.). Such a rule would, indeed, obviate the fear that the prospect of civil liability for injurious falsehood might dissuade a timorous press from the effective exercise of First Amendment freedoms. Yet absolute protection for the communications media requires a total sacrifice· of the competing value served by the law of defamation.

The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as MR. JUSTICE STEWART has reminded us, the individual's right to the protection of his own good name

> "reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt* v. *Baer,* 383 U. S. 75, 92 (1966) (concurring opinion).

Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury. As Mr. Justice Harlan stated, "some antithesis between freedom of speech and press and libel actions persists, for libel remains premised on the content of speech and limits the freedom of the publisher to express certain sentiments, at least without guaranteeing legal proof of their substantial accuracy." *Curtis Publishing Co.* v. *Butts, supra,* at 152. In our continuing effort to define the proper accommodation between these competing concerns, we have been especially anxious to assure to the freedoms of speech and press that "breathing space" essential to their fruitful exercise. *NAACP* v. *Button,* 371 U. S. 415, 433 (1963). To that end this Court has extended a measure of strategic protection to defamatory falsehood.

The *New York Times* standard defines the level of constitutional protection appropriate to the context of defamation of a public person. Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test. Despite this

substantial abridgment of the state law right to compensation for wrongful hurt to one's reputation, the Court has concluded that the protection of the *New York Times* privilege should be available to publishers and broadcasters of defamatory falsehood concerning public officials and public figures. *New York Times Co.* v. *Sullivan, supra; Curtis Publishing Co.* v. *Butts, supra.* We think that these decisions are correct, but we do not find their holdings justified solely by reference to the interest of the press and broadcast media in immunity from liability. Rather, we believe that the *New York Times* rule states an accommodation between this concern and the limited state interest present in the context of libel actions brought by public persons. For the reasons stated below, we conclude that the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them.

Theoretically, of course, the balance between the needs of the press and the individual's claim to compensation for wrongful injury might be struck on a case-by-case basis. As Mr. Justice Harlan hypothesized, "it might seem, purely as an abstract matter, that the most utilitarian approach would be to scrutinize carefully every jury verdict in every libel case, in order to ascertain whether the final judgment leaves fully protected whatever First Amendment values transcend the legitimate state interest in protecting the particular plaintiff who prevailed." *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S., at 63 (footnote omitted). But this approach would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable. Because an *ad hoc* resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general

application. Such rules necessarily treat alike various cases involving differences as well as similarities. Thus it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority.

With that caveat we have no difficulty in distinguishing among defamation plaintiffs. The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.[9] Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers of government is not strictly limited to the formal discharge of official duties. As the Court pointed out in *Garrison* v. *Louisiana*, 379 U. S., at 77, the public's interest extends to "anything

---

[9] Of course, an opportunity for rebuttal seldom suffices to undo harm of defamatory falsehood. Indeed, the law of defamation is rooted in our experience that the truth rarely catches up with a lie. But the fact that the self-help remedy of rebuttal, standing alone, is inadequate to its task does not mean that it is irrelevant to our inquiry.

which might touch on an official's fitness for office . . . . Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character."

Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an "influential role in ordering society." *Curtis Publishing Co.* v. *Butts,* 388 U. S., at 164 (Warren, C. J., concurring in result). He has relinquished no part of his interest in the protection of his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and public figures; they are also more deserving of recovery.

For these reasons we conclude that the States should retain substantial latitude in their efforts to enforce a

legal remedy for defamatory falsehood injurious to the reputation of a private individual. The extension of the *New York Times* test proposed by the *Rosenbloom* plurality would abridge this legitimate state interest to a degree that we find unacceptable. And it would occasion the additional difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of "general or public interest" and which do not—to determine, in the words of MR. JUSTICE MARSHALL, "what information is relevant to self-government." *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S., at 79. We doubt the wisdom of committing this task to the conscience of judges. Nor does the Constitution require us to draw so thin a line between the drastic alternatives of the *New York Times* privilege and the common law of strict liability for defamatory error. The "public or general interest" test for determining the applicability of the *New York Times* standard to private defamation actions inadequately serves both of the competing values at stake. On the one hand, a private individual whose reputation is injured by defamatory falsehood that does concern an issue of public or general interest has no recourse unless he can meet the rigorous requirements of *New York Times.* This is true despite the factors that distinguish the state interest in compensating private individuals from the analogous interest involved in the context of public persons. On the other hand, a publisher or broadcaster of a defamatory error which a court deems unrelated to an issue of public or general interest may be held liable in damages even if it took every reasonable precaution to ensure the accuracy of its assertions. And liability may far exceed compensation for any actual injury to the plaintiff, for the jury may be permitted to presume damages without proof of loss and even to award punitive damages.

We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.[10]  This approach provides a more equitable

[10] Our caveat against strict liability is the prime target of MR. JUSTICE WHITE's dissent.  He would hold that a publisher or broadcaster may be required to prove the truth of a defamatory statement concerning a private individual and, failing such proof, that the publisher or broadcaster may be held liable for defamation even though he took every conceivable precaution to ensure the accuracy of the offending statement prior to its dissemination.  *Post*, at 388–392.  In MR. JUSTICE WHITE's view, one who publishes a statement that later turns out to be inaccurate can never be "without fault" in any meaningful sense, for "[i]t is he who circulated a falsehood *that he was not required to publish.*"  *Post*, at 392 (emphasis added).

MR. JUSTICE WHITE characterizes *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), as simply a case of seditious libel.  *Post*, at 387.  But that rationale is certainly inapplicable to *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130 (1967), where MR. JUSTICE WHITE joined four other Members of the Court to extend the knowing-or-reckless-falsity standard to media defamation of persons identified as public figures but not connected with the Government.  MR. JUSTICE WHITE now suggests that he would abide by that vote, *post*, at 398, but the full thrust of his dissent—as we read it—contradicts that suggestion.  Finally, in *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 57 (1971), MR. JUSTICE WHITE voted to apply the *New York Times* privilege to media defamation of an individual who was neither a public official nor a public figure.  His opinion states that the knowing-or-reckless-falsity standard should apply to media "comment upon the official actions of public servants," *id.*, at 62, including defamatory falsehood about a person arrested by the police.  If adopted by the Court, this conclusion would significantly extend the *New York Times* privilege.

MR. JUSTICE WHITE asserts that our decision today "trivializes and denigrates the interest in reputation," *Miami Herald Publishing Co.* v. *Tornillo, ante*, at 262 (concurring opinion), that it "scuttle[s] the libel laws of the States in . . . wholesale fashion" and renders ordinary citizens "powerless to protect themselves."  *Post*, at 370.  In light of the progressive extension of the knowing-or-reckless-falsity

boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. At least this conclusion obtains where, as here, the substance of the defamatory statement "makes substantial danger to reputation apparent." [11] This phrase places in perspective the conclusion we announce today. Our inquiry would involve considerations somewhat different from those discussed above if a State purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential. Cf. *Time, Inc.* v. *Hill*, 385 U. S. 374 (1967). Such a case is not now before us, and we intimate no view as to its proper resolution.

## IV

Our accommodation of the competing values at stake in defamation suits by private individuals allows the States to impose liability on the publisher or broadcaster of defamatory falsehood on a less demanding showing than that required by *New York Times*. This conclusion is not based on a belief that the considerations which prompted the adoption of the *New York Times* privilege for defamation of public officials and its extension to public figures are wholly inapplicable to the context of private individuals. Rather, we endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputa-

---

requirement detailed in the preceding paragraph, one might have viewed today's decision allowing recovery under any standard save strict liability as a more generous accommodation of the state interest in comprehensive reputational injury to private individuals than the law presently affords.

[11] *Curtis Publishing Co.* v. *Butts, supra,* at 155.

tion. But this countervailing state interest extends no further than compensation for actual injury. For the reasons stated below, we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.

The common law of defamation is an oddity of tort law, for it allows recovery of purportedly compensatory damages without evidence of actual loss. Under the traditional rules pertaining to actions for libel, the existence of injury is presumed from the fact of publication. Juries may award substantial sums as compensation for supposed damage to reputation without any proof that such harm actually occurred. The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms. Additionally, the doctrine of presumed damages invites juries to punish unpopular opinion rather than to compensate individuals for injury sustained by the publication of a false fact. More to the point, the States have no substantial interest in securing for plaintiffs such as this petitioner gratuitous awards of money damages far in excess of any actual injury.

We would not, of course, invalidate state law simply because we doubt its wisdom, but here we are attempting to reconcile state law with a competing interest grounded in the constitutional command of the First Amendment. It is therefore appropriate to require that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved. It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We

need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury.

We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation. In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused. And they remain free to use their discretion selectively to punish expressions of unpopular views. Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship, but, unlike the former rule, punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions. They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by *New York Times* may recover only such damages as are sufficient to compensate him for actual injury.

## V

Notwithstanding our refusal to extend the *New York Times* privilege to defamation of private individuals, respondent contends that we should affirm the judgment below on the ground that petitioner is either a public official or a public figure. There is little basis for the former assertion. Several years prior to the present incident, petitioner had served briefly on housing committees appointed by the mayor of Chicago, but at the time of publication he had never held any remunerative governmental position. Respondent admits this but argues that petitioner's appearance at the coroner's inquest rendered him a "de facto public official." Our cases recognize no such concept. Respondent's suggestion would sweep all lawyers under the *New York Times* rule as officers of the court and distort the plain meaning of the "public official" category beyond all recognition. We decline to follow it.

Respondent's characterization of petitioner as a public figure raises a different question. That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

Petitioner has long been active in community and professional affairs. He has served as an officer of local civic groups and of various professional organizations, and he has published several books and articles on legal subjects. Although petitioner was consequently well known in some circles, he had achieved no general fame

or notoriety in the community. None of the prospective jurors called at the trial had ever heard of petitioner prior to this litigation, and respondent offered no proof that this response was atypical of the local population. We would not lightly assume that a citizen's participation in community and professional affairs rendered him a public figure for all purposes. Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.

In this context it is plain that petitioner was not a public figure. He played a minimal role at the coroner's inquest, and his participation related solely to his representation of a private client. He took no part in the criminal prosecution of Officer Nuccio. Moreover, he never discussed either the criminal or civil litigation with the press and was never quoted as having done so. He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public's attention in an attempt to influence its outcome. We are persuaded that the trial court did not err in refusing to characterize petitioner as a public figure for the purpose of this litigation.

We therefore conclude that the *New York Times* standard is inapplicable to this case and that the trial court erred in entering judgment for respondent. Because the jury was allowed to impose liability without fault and was permitted to presume damages without proof of injury, a new trial is necessary. We reverse and remand for further proceedings in accord with this opinion.

*It is so ordered.*

MR. JUSTICE BLACKMUN, concurring.

I joined MR. JUSTICE BRENNAN's opinion for the plurality in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971). I did so because I concluded that, given *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and its progeny (noted by the Court, *ante,* at 334–336, n. 6), as well as *Curtis Publishing Co.* v. *Butts* and *Associated Press* v. *Walker,* 388 U. S. 130 (1967), the step taken in *Rosenbloom,* extending the *New York Times* doctrine to an event of public or general interest, was logical and inevitable. A majority of the Court evidently thought otherwise, as is particularly evidenced by MR. JUSTICE WHITE's separate concurring opinion there and by the respective dissenting opinions of Mr. Justice Harlan and of MR. JUSTICE MARSHALL joined by MR. JUSTICE STEWART.

The Court today refuses to apply *New York Times* to the private individual, as contrasted with the public official and the public figure. It thus withdraws to the factual limits of the pre-*Rosenbloom* cases. It thereby fixes the outer boundary of the *New York Times* doctrine and says that beyond that boundary, a State is free to define for itself the appropriate standard of media liability so long as it does not impose liability without fault. As my joinder in *Rosenbloom's* plurality opinion would intimate, I sense some illogic in this.

The Court, however, seeks today to strike a balance between competing values where necessarily uncertain assumptions about human behavior color the result. Although the Court's opinion in the present case departs from the rationale of the *Rosenbloom* plurality, in that the Court now conditions a libel action by a private person upon a showing of negligence, as contrasted with a showing of willful or reckless disregard, I am willing to

join, and do join, the Court's opinion and its judgment for two reasons:

1. By removing the specters of presumed and punitive damages in the absence of *New York Times* malice, the Court eliminates significant and powerful motives for self-censorship that otherwise are present in the traditional libel action. By so doing, the Court leaves what should prove to be sufficient and adequate breathing space for a vigorous press. What the Court has done, I believe, will have little, if any, practical effect on the functioning of responsible journalism.

2. The Court was sadly fractionated in *Rosenbloom*. A result of that kind inevitably leads to uncertainty. I feel that it is of profound importance for the Court to come to rest in the defamation area and to have a clearly defined majority position that eliminates the unsureness engendered by *Rosenbloom*'s diversity. If my vote were not needed to create a majority, I would adhere to my prior view. A definitive ruling, however, is paramount. See *Curtis Publishing Co.* v. *Butts,* 388 U. S., at 170 (Black, J., concurring); *Time, Inc.* v. *Hill,* 385 U. S. 374, 398 (1967) (Black, J., concurring); *United States* v. *Vuitch,* 402 U. S. 62, 97 (1971) (separate statement).

For these reasons, I join the opinion and the judgment of the Court.

MR. CHIEF JUSTICE BURGER, dissenting.

The doctrines of the law of defamation have had a gradual evolution primarily in the state courts. In *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and its progeny this Court entered this field.

Agreement or disagreement with the law as it has evolved to this time does not alter the fact that it has been orderly development with a consistent basic rationale. In today's opinion the Court abandons the tradi-

tional thread so far as the ordinary private citizen is concerned and introduces the concept that the media will be liable for negligence in publishing defamatory statements with respect to such persons. Although I agree with much of what MR. JUSTICE WHITE states, I do not read the Court's new doctrinal approach in quite the way he does. I am frank to say I do not know the parameters of a "negligence" doctrine as applied to the news media. Conceivably this new doctrine could inhibit some editors, as the dissents of MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN suggest. But I would prefer to allow this area of law to continue to evolve as it has up to now with respect to private citizens rather than embark on a new doctrinal theory which has no jurisprudential ancestry.

The petitioner here was performing a professional representative role as an advocate in the highest tradition of the law, and under that tradition the advocate is not to be invidiously identified with his client. The important public policy which underlies this tradition—the right to counsel—would be gravely jeopardized if every lawyer who takes an "unpopular" case, civil or criminal, would automatically become fair game for irresponsible reporters and editors who might, for example, describe the lawyer as a "mob mouthpiece" for representing a client with a serious prior criminal record, or as an "ambulance chaser" for representing a claimant in a personal injury action.

I would reverse the judgment of the Court of Appeals and remand for reinstatement of the verdict of the jury and the entry of an appropriate judgment on that verdict.

MR. JUSTICE DOUGLAS, dissenting.

The Court describes this case as a return to the struggle of "defin[ing] the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." It is indeed a struggle, once described by Mr. Justice Black as "the same

quagmire" in which the Court "is now helplessly struggling in the field of obscenity." *Curtis Publishing Co.* v. *Butts,* 388 U. S. 130, 171 (concurring opinion). I would suggest that the struggle is a quite hopeless one, for, in light of the command of the First Amendment, no "accommodation" of its freedoms can be "proper" except those made by the Framers themselves.

Unlike the right of privacy which, by the terms of the Fourth Amendment, must be accommodated with reasonable searches and seizures and warrants issued by magistrates, the rights of free speech and of a free press were protected by the Framers in verbiage whose proscription seems clear. I have stated before my view that the First Amendment would bar Congress from passing any libel law.[1] This was the view held by Thomas Jefferson[2] and it is one Congress has never challenged through enactment of a civil libel statute. The sole congressional attempt at this variety of First Amendment muzzle was in the Sedition Act of 1798—a criminal libel act never tested in this Court and one which expired by its terms three years after enactment. As President, Thomas Jefferson pardoned those who were convicted under the Act, and fines levied in its prosecution were repaid by Act of Congress.[3] The general

---

[1] See, *e. g., Rosenblatt* v. *Baer,* 383 U. S. 75, 90 (concurring).

[2] In 1798 Jefferson stated:

"[The First Amendment] thereby guard[s] in the same sentence, and under the same words, the freedom of religion, of speech, and of the press: insomuch, that whatever violates either, throws down the sanctuary which covers the others, *and that libels, falsehood, and defamation, equally with heresy and false religion, are withheld from the cognizance of federal tribunals. . . .*" 8 The Works of Thomas Jefferson 464–465 (Ford ed. 1904) (emphasis added).

[3] See, *e. g.,* Act of July 4, 1840, c. 45, 6 Stat. 802, accompanied by H. R. Rep. No. 86, 26th Cong., 1st Sess. (1840).

consensus was that the Act constituted a regrettable legislative exercise plainly in violation of the First Amendment.[4]

With the First Amendment made applicable to the States through the Fourteenth,[5] I do not see how States have any more ability to "accommodate" freedoms of speech or of the press than does Congress. This is true whether the form of the accommodation is civil or criminal since "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 277. Like Congress, States are without power "to use a civil libel law or any other law to impose damages for merely discussing public affairs." *Id.,* at 295 (Black, J., concurring).[6]

---

[4] Senator Calhoun in reporting to Congress assumed the invalidity of the Act to be a matter "which no one now doubts." Report with Senate Bill No. 122, S. Doc. No. 118, 24th Cong., 1st Sess., 3 (1836).

[5] See *Stromberg* v. *California,* 283 U. S. 359, 368–369.

[6] Since this case involves a discussion of public affairs, I need not decide at this point whether the First Amendment prohibits all libel actions. "An unconditional right to say what one pleases about public affairs is what I consider to be the *minimum* guarantee of the First Amendment." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 297 (Black, J., concurring) (emphasis added). But "public affairs" includes a great deal more than merely political affairs. Matters of science, economics, business, art, literature, etc., are all matters of interest to the general public. Indeed, any matter of sufficient general interest to prompt media coverage may be said to be a public affair. Certainly police killings, "Communist conspiracies," and the like qualify.

A more regressive view of free speech has surfaced but it has thus far gained no judicial acceptance. Solicitor General Bork has stated:

"Constitutional protection should be accorded only to speech that is explicitly political. There is no basis for judicial intervention to protect any other form of expression, be it scientific, literary or

Continued recognition of the possibility of state libel suits for public discussion of public issues leaves the freedom of speech honored by the Fourteenth Amendment a diluted version of First Amendment protection. This view is only possible if one accepts the position that the First Amendment is applicable to the States only through the Due Process Clause of the Fourteenth, due process freedom of speech being only that freedom which this Court might deem to be "implicit in the concept of ordered liberty." [7] But the Court frequently has rested

that variety of expression we call obscene or pornographic. Moreover, within that category of speech we ordinarly call political, there should be no constitutional obstruction to laws making criminal any speech that advocates forcible overthrow of the government or the violation of any law." Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 20 (1971).

According to this view, Congress, upon finding a painting aesthetically displeasing or a novel poorly written or a revolutionary new scientific theory unsound could constitutionally prohibit exhibition of the painting, distribution of the book or discussion of the theory. Congress might also proscribe the advocacy of the violation of any law, apparently without regard to the law's constitutionality. Thus, were Congress to pass a blatantly invalid law such as one prohibiting newspaper editorials critical of the Government, a publisher might be punished for advocating its violation. Similarly, the late Dr. Martin Luther King, Jr., could have been punished for advising blacks to peacefully sit in the front of buses or to ask for service in restaurants segregated by law.

[7] See *Palko* v. *Connecticut*, 302 U. S. 319, 325. As Mr. Justice Black has noted, by this view the test becomes "whether the government has an interest in abridging the right involved and, if so, whether that interest is of sufficient importance, *in the opinion of a majority of the Supreme Court*, to justify the government's action in doing so. Such a doctrine can be used to justify almost any government suppression of First Amendment freedoms. As I have stated many times before, I cannot subscribe to this doctrine because I believe that the First Amendment's unequivocal command that there shall be no abridgement of the rights of free speech shows that the men

state free speech and free press decisions on the Fourteenth Amendment generally[8] rather than on the Due Process Clause alone. The Fourteenth Amendment speaks not only of due process but also of "privileges and immunities" of United States citizenship. I can conceive of no privilege or immunity with a higher claim to recognition against state abridgment than the freedoms of speech and of the press. In our federal system we are all subject to two governmental regimes, and freedoms of speech and of the press protected against the infringement of only one are quite illusory. The identity of the oppressor is, I would think, a matter of relative indifference to the oppressed.

There can be no doubt that a State impinges upon free and open discussion when it sanctions the imposition of damages for such discussion through its civil libel laws. Discussion of public affairs is often marked by highly charged emotions, and jurymen, not unlike us all, are subject to those emotions. It is indeed this very type of speech which is the reason for the First Amendment since speech which arouses little emotion is little in need of protection. The vehicle for publication in this case was the American Opinion, a most controversial periodical which disseminates the views of the John Birch Society, an organization which many deem to be

who drafted our Bill of Rights did all the 'balancing' that was to be done in this field." H. Black, A Constitutional Faith 52 (1969).

[8] See, e. g., Bridges v. California, 314 U. S. 252, 263 n. 6 (Black, J.); Murdock v. Pennsylvania, 319 U. S. 105, 108 (DOUGLAS, J.); Saia v. New York, 334 U. S. 558, 560 (DOUGLAS, J.); Talley v. California, 362 U. S. 60, 62 (Black, J.); DeGregory v. Attorney General of New Hampshire, 383 U. S. 825, 828 (DOUGLAS, J.); Elfbrandt v. Russell, 384 U. S. 11, 18 (DOUGLAS, J.); Mills v. Alabama, 384 U. S. 214, 218 (Black, J.); Mine Workers v. Illinois Bar Assn., 389 U. S. 217, 221–222, and n. 4 (Black, J.).

quite offensive. The subject matter involved "Communist plots," "conspiracies against law enforcement agencies," and the killing of a private citizen by the police. With any such amalgam of controversial elements pressing upon the jury, a jury determination, unpredictable in the most neutral circumstances, becomes for those who venture to discuss heated issues, a virtual roll of the dice separating them from liability for often massive claims of damage.

It is only the hardy publisher who will engage in discussion in the face of such risk, and the Court's preoccupation with proliferating standards in the area of libel increases the risks. It matters little whether the standard be articulated as "malice" or "reckless disregard of the truth" or "negligence," for jury determinations by any of those criteria are virtually unreviewable. This Court, in its continuing delineation of variegated mantles of First Amendment protection, is, like the potential publisher, left with only speculation on how jury findings were influenced by the effect the subject matter of the publication had upon the minds and viscera of the jury. The standard announced today leaves the States free to "define for themselves the appropriate standard of liability for a publisher or broadcaster" in the circumstances of this case. This of course leaves the simple negligence standard as an option, with the jury free to impose damages upon a finding that the publisher failed to act as "a reasonable man." With such continued erosion of First Amendment protection, I fear that it may well be the reasonable man who refrains from speaking.

Since in my view the First and Fourteenth Amendments prohibit the imposition of damages upon respondent for this discussion of public affairs, I would affirm the judgment below.

Mr. Justice Brennan, dissenting.

I agree with the conclusion, expressed in Part V of the Court's opinion, that, at the time of publication of respondent's article, petitioner could not properly have been viewed as either a "public official" or "public figure"; instead, respondent's article, dealing with an alleged conspiracy to discredit local police forces, concerned petitioner's purported involvement in "an event of public or general interest." *Roosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 31–32 (1971); see *ante,* at 331–332, n. 4. I cannot agree, however, that free and robust debate— so essential to the proper functioning of our system of government—is permitted adequate "breathing space," *NAACP* v. *Button,* 371 U. S. 415, 433 (1963), when, as the Court holds, the States may impose all but strict liability for defamation if the defamed party is a private person and "the substance of the defamatory statement 'makes substantial danger to reputation apparent.'" *Ante,* at 348.[1] I adhere to my view expressed in *Rosenbloom* v. *Metromedia, Inc., supra,* that we strike the proper accommodation between avoidance of media self-censorship and protection of individual reputations only when we require States to apply the *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), knowing-or-reckless-falsity standard in civil libel actions concerning media reports of the involvement of private individuals in events of public or general interest.

The Court does not hold that First Amendment guarantees do not extend to speech concerning private persons' involvement in events of public or general interest. It recognizes that self-governance in this country perseveres because of our "profound national com-

---

[1] *A fortiori* I disagree with my Brother White's view that the States should have free rein to impose strict liability for defamation in cases not involving public persons.

mitment to the principle that debate on *public issues* should be uninhibited, robust, and wide-open." *Id.*, at 270 (emphasis added). Thus, guarantees of free speech and press necessarily reach "far more than knowledge and debate about the strictly official activities of various levels of government," *Rosenbloom* v. *Metromedia, Inc., supra,* at 41; for "[f]reedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama,* 310 U. S. 88, 102 (1940).

The teaching to be distilled from our prior cases is that, while public interest in events may at times be influenced by the notoriety of the individuals involved, "[t]he public's primary interest is in the event[,] . . . the conduct of the participant and the content, effect, and significance of the conduct . . . ." *Rosenbloom, supra,* at 43. Matters of public or general interest do not "suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved." *Ibid.* See *Time, Inc.* v. *Hill,* 385 U. S. 374, 388 (1967).

Although acknowledging that First Amendment values are of no less significance when media reports concern private persons' involvement in matters of public concern, the Court refuses to provide, in such cases, the same level of constitutional protection that has been afforded the media in the context of defamation of public persons. The accommodation that this Court has established between free speech and libel laws in cases involving public officials and public figures—that defamatory falsehood be shown by clear and convincing evidence to have been published with knowledge of falsity or with reckless disregard of truth—is not apt, the Court holds, because

the private individual does not have the same degree of access to the media to rebut defamatory comments as does the public person and he has not voluntarily exposed himself to public scrutiny.

While these arguments are forcefully and eloquently presented, I cannot accept them, for the reasons I stated in *Rosenbloom:*

> "The *New York Times* standard was applied to libel of a public official or public figure to give effect to the [First] Amendment's function to encourage ventilation of public issues, not because the public official has any less interest in protecting his reputation than an individual in private life. While the argument that public figures need less protection because they can command media attention to counter criticism may be true for some very prominent people, even then it is the rare case where the denial overtakes the original charge. Denials, retractions, and corrections are not 'hot' news, and rarely receive the prominence of the original story. When the public official or public figure is a minor functionary, or has left the position that put him in the public eye . . . , the argument loses all of its force. In the vast majority of libels involving public officials or public figures, the ability to respond through the media will depend on the same complex factor on which the ability of a private individual depends: the unpredictable event of the media's continuing interest in the story. Thus the unproved, and highly improbable, generalization that an as yet [not fully defined] class of 'public figures' involved in matters of public concern will be better able to respond through the media than private individuals also involved in such matters seems too insubstantial

a reed on which to rest a constitutional distinction."
403 U. S., at 46–47.

Moreover, the argument that private persons should not be required to prove *New York Times* knowing-or-reckless falsity because they do not assume the risk of defamation by freely entering the public arena "bears little relationship either to the values protected by the First Amendment or to the nature of our society." *Id.*, at 47. Social interaction exposes all of us to some degree of public view. This Court has observed that "[t]he risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press." *Time, Inc.* v. *Hill,* 385 U. S., at 388. Therefore,

"[v]oluntarily or not, we are all 'public' men to some degree. Conversely, some aspects of the lives of even the most public men fall outside the area of matters of public or general concern. See . . . *Griswold* v. *Connecticut,* 381 U. S. 479 (1965). Thus, the idea that certain 'public' figures have voluntarily exposed their entire lives to public inspection, while private individuals have kept theirs carefully shrouded from public view is, at best, a legal fiction. In any event, such a distinction could easily produce the paradoxical result of dampening discussion of issues of public or general concern because they happen to involve private citizens while extending constitutional encouragement to discussion of aspects of the lives of 'public figures' that are not in the area of public or general concern." *Rosenbloom, supra,* at 48 (footnote omitted).

To be sure, no one commends publications which defame the good name and reputation of any person: "In an ideal world, the responsibility of the press would match the freedom and public trust given it." *Id.,* at

51.[2]  Rather, as the Court agrees, some abuse of First Amendment freedoms is tolerated only to insure that would-be commentators on events of public or general interest are not "deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *New York Times Co.* v. *Sullivan,* 376 U. S., at 279.  The Court's holding and *a fortiori* my Brother WHITE's views, see n. 1, *supra,* simply deny free expression its needed "breathing space."  Today's decision will exacerbate the rule of self-censorship of legitimate utterance as publishers "steer far wider of the unlawful zone," *Speiser* v. *Randall,* 357 U. S. 513, 526 (1958).

We recognized in *New York Times Co.* v. *Sullivan, supra,* at 279, that a rule requiring a critic of official conduct to guarantee the truth of all of his factual contentions would inevitably lead to self-censorship when

---

[2] A respected commentator has observed that factors other than purely legal constraints operate to control the press:

"Traditions, attitudes, and general rules of political conduct are far more important controls.  The fear of opening a credibility gap, and thereby lessening one's influence, holds some participants in check.  Institutional pressures in large organizations, including some of the press, have a similar effect; it is difficult for an organization to have an open policy of making intentionally false accusations."  T. Emerson, The System of Freedom of Expression 538 (1970).

Typical of the press' own ongoing self-evaluation is a proposal to establish a national news council, composed of members drawn from the public and the journalism profession, to examine and report on complaints concerning the accuracy and fairness of news reporting by the largest newsgathering sources.  Twentieth Century Fund Task Force Report for a National News Council, A Free and Responsive Press (1973).  See also Comment, The Expanding Constitutional Protection for the News Media from Liability for Defamation: Predictability and the New Synthesis, 70 Mich. L. Rev. 1547, 1569–1570 (1972).

publishers, fearful of being unable to prove truth or unable to bear the expense of attempting to do so, simply eschewed printing controversial articles. Adoption, by many States, of a reasonable-care standard in cases where private individuals are involved in matters of public interest—the probable result of today's decision—will likewise lead to self-censorship since publishers will be required carefully to weigh a myriad of uncertain factors before publication. The reasonable-care standard is "elusive," *Time, Inc.* v. *Hill, supra,* at 389; it saddles the press with "the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait." *Ibid.* Under a reasonable-care regime, publishers and broadcasters will have to make pre-publication judgments about juror assessment of such diverse considerations as the size, operating procedures, and financial condition of the newsgathering system, as well as the relative costs and benefits of instituting less frequent and more costly reporting at a higher level of accuracy. See The Supreme Court, 1970 Term, 85 Harv. L. Rev. 3, 228 (1971). Moreover, in contrast to proof by clear and convincing evidence required under the *New York Times* test, the burden of proof for reasonable care will doubtless be the preponderance of the evidence.

> "In the normal civil suit where [the preponderance of the evidence] standard is employed, 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' *In re Winship,* 397 U. S. 358, 371 (1970) (HARLAN, J., concurring). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement . . . but the

possibility of such error, even beyond the vague-
ness of the negligence standard itself, would create
a strong impetus toward self-censorship, which the
First Amendment cannot tolerate." *Rosenbloom*,
403 U. S., at 50.

And, most hazardous, the flexibility which inheres in
the reasonable-care standard will create the danger that
a jury will convert it into "an instrument for the sup-
pression of those 'vehement, caustic, and sometimes un-
pleasantly sharp attacks,' . . . which must be protected
if the guarantees of the First and Fourteenth Amend-
ments are to prevail." *Monitor Patriot Co.* v. *Roy,* 401
U. S. 265, 277 (1971).

The Court does not discount altogether the danger
that jurors will punish for the expression of unpopular
opinions. This probability accounts for the Court's
limitation that "the States may not permit recovery
of presumed or punitive damages, at least when liability
is not based on a showing of knowledge of falsity or
reckless disregard for the truth." *Ante,* at 349. But
plainly a jury's latitude to impose liability for want of
due care poses a far greater threat of suppressing un-
popular views than does a possible recovery of presumed
or punitive damages. Moreover, the Court's broad-rang-
ing examples of "actual injury," including impairment of
reputation and standing in the community, as well as
personal humiliation, and mental anguish and suffering,
inevitably allow a jury bent on punishing expression of
unpopular views a formidable weapon for doing so.
Finally, even a limitation of recovery to "actual in-
jury"—however much it reduces the size or frequency
of recoveries—will not provide the necessary elbowroom
for First Amendment expression.

"It is not simply the possibility of a judgment for
damages that results in self-censorship. The very

> possibility of having to engage in litigation, an expensive and protracted process, is threat enough to cause discussion and debate to 'steer far wider of the unlawful zone' thereby keeping protected discussion from public cognizance. . . . Too, a small newspaper suffers equally from a substantial damage award, whether the label of the award be 'actual' or 'punitive.'" *Rosenbloom, supra,* at 52–53.

On the other hand, the uncertainties which the media face under today's decision are largely avoided by the *New York Times* standard. I reject the argument that my *Rosenbloom* view improperly commits to judges the task of determining what is and what is not an issue of "general or public interest."[3] I noted in *Rosenbloom*

---

[3] The Court, taking a novel step, would not limit application of First Amendment protection to private libels involving issues of general or public interest, but would forbid the States from imposing liability without fault in any case where the substance of the defamatory statement made substantial danger to reputation apparent. As in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 44 n. 12, 48–49, n. 17 (1971), I would leave open the question of what constitutional standard, if any, applies when defamatory falsehoods are published or broadcast concerning either a private or public person's activities not within the scope of the general or public interest.

Parenthetically, my Brother WHITE argues that the Court's view and mine will prevent a plaintiff—unable to demonstrate some degree of fault—from vindicating his reputation by securing a judgment that the publication was false. This argument overlooks the possible enactment of statutes, not requiring proof of fault, which provide for an action for retraction or for publication of a court's determination of falsity if the plaintiff is able to demonstrate that false statements have been published concerning his activities. Cf. Note, Vindication of the Reputation of a Public Official, 80 Harv. L. Rev. 1730, 1739–1747 (1967). Although it may be that questions could be raised concerning the constitutionality of such statutes, certainly nothing I have said today (and, as I read the Court's opinion, nothing said there) should be read to imply that a private plaintiff, unable to prove fault, must inevitably be denied the oppor-

that performance of this task would not always be easy. *Id.*, at 49 n. 17. But surely the courts, the ultimate arbiters of all disputes concerning clashes of constitutional values, would only be performing one of their traditional functions in undertaking this duty. Also, the difficulty of this task has been substantially lessened by that "sizable body of cases, decided both before and after *Rosenbloom,* that have employed the concept of a matter of public concern to reach decisions in . . . cases dealing with an alleged libel of a private individual that employed a public interest standard . . . and . . . cases that applied *Butts* to the alleged libel of a public figure." Comment, The Expanding Constitutional Protection for the News Media from Liability for Defamation: Predictability and the New Synthesis, 70 Mich. L. Rev. 1547, 1560 (1972). The public interest is necessarily broad; any residual self-censorship that may result from the uncertain contours of the "general or public interest" concept should be of far less concern to publishers and broadcasters than that occasioned by state laws imposing liability for negligent falsehood.

Since petitioner failed, after having been given a full and fair opportunity, to prove that respondent published the disputed article with knowledge of its falsity or with reckless disregard of the truth, see *ante,* at 329–330, n. 2, I would affirm the judgment of the Court of Appeals.

Mr. Justice White, dissenting.

For some 200 years—from the very founding of the Nation—the law of defamation and right of the ordinary citizen to recover for false publication injurious to his reputation have been almost exclusively the business of

tunity to secure a judgment upon the truth or falsity of statements published about him. Cf. *Rosenbloom* v. *Metromedia, Inc., supra,* at 47, and n. 15.

state courts and legislatures. Under typical state defamation law, the defamed private citizen had to prove only a false publication that would subject him to hatred, contempt, or ridicule. Given such publication, general damage to reputation was presumed, while punitive damages required proof of additional facts. The law governing the defamation of private citizens remained untouched by the First Amendment because until relatively recently, the consistent view of the Court was that libelous words constitute a class of speech wholly unprotected by the First Amendment, subject only to limited exceptions carved out since 1964.

But now, using that Amendment as the chosen instrument, the Court, in a few printed pages, has federalized major aspects of libel law by declaring unconstitutional in important respects the prevailing defamation law in all or most of the 50 States. That result is accomplished by requiring the plaintiff in each and every defamation action to prove not only the defendant's culpability beyond his act of publishing defamatory material but also actual damage to reputation resulting from the publication. Moreover, punitive damages may not be recovered by showing malice in the traditional sense of ill will; knowing falsehood or reckless disregard of the truth will now be required.

I assume these sweeping changes will be popular with the press, but this is not the road to salvation for a court of law. As I see it, there are wholly insufficient grounds for scuttling the libel laws of the States in such wholesale fashion, to say nothing of deprecating the reputation interest of ordinary citizens and rendering them powerless to protect themselves. I do not suggest that the decision is illegitimate or beyond the bounds of judicial review, but it is an ill-considered exercise of the power entrusted to this Court, particularly when the

Court has not had the benefit of briefs and argument addressed to most of the major issues which the Court now decides. I respectfully dissent.

# I

Lest there be any mistake about it, the changes wrought by the Court's decision cut very deeply. In 1938, the Restatement of Torts reflected the historic rule that publication in written form of defamatory material—material tending "so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" [1]—subjected the publisher to liability although no special harm to reputation was actually proved.[2] Re-

---

[1] Restatement of Torts § 559 (1938); see also W. Prosser, Law of Torts § 111, p. 739 (4th ed. 1971); 1 A. Hanson, Libel and Related Torts ¶ 14, pp. 21–22 (1969); 1 F. Harper & F. James, The Law of Torts § 5.1, pp. 349–350 (1956).

[2] The observations in Part I of this opinion as to the current state of the law of defamation in the various States are partially based upon the Restatement of Torts, first published in 1938, and Tentative Drafts Nos. 11 and 12 of Restatement of Torts (Second), released in 1965 and 1966, respectively. The recent transmittal of Tentative Draft No. 20, dated April 25, 1974, to the American Law Institute for its consideration has resulted in the elimination of much of the discussion of the prevailing defamation rules and the suggested changes in many of the rules themselves previously found in the earlier Tentative Drafts. This development appears to have been largely influenced by the draftsmen's "sense for where the law of this important subject should be thought to stand." Restatement (Second) of Torts, p. vii (Tent. Draft No. 20, Apr. 25, 1974). It is evident that, to a large extent, these latest views are colored by the plurality opinion in *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29 (1971). See, *e. g.,* Restatement (Second) of Torts, *supra,* at xiii, §§ 569, 580, 581A, 581B, 621. There is no indication in the latest draft, however, that the conclusions reached in Tentative Drafts Nos. 11 and 12 are not an accurate reflection of the case law in the States in the mid-1960's prior to the developments occasioned by the plurality opinion in *Rosenbloom.* See *infra,* at 374–375.

statement of Torts § 569 (1938).[3] Truth was a defense, and some libels were privileged; but, given a false circulation, general damage to reputation was presumed and damages could be awarded by the jury, along with any special damages such as pecuniary loss and emotional distress. At the very least, the rule allowed the recovery of nominal damages for any defamatory publication actionable *per se* and thus performed

> "a vindicatory function by enabling the plaintiff publicly to brand the defamatory publication as false. The salutary social value of this rule is preventive in character since it often permits a defamed person to expose the groundless character of a defamatory rumor before harm to the reputation has resulted therefrom." *Id.,* § 569, comment b, p. 166.

If the defamation was not libel but slander, it was actionable *per se* only if it imputed a criminal offense; a venereal or loathsome and communicable disease; improper conduct of a lawful business; or unchastity by a woman. *Id.,* § 570. To be actionable, all other types of slanderous statements required proof of special damage other than actual loss of reputation or emotional distress, that special damage almost always being in the form of material or pecuniary loss of some kind. *Id.,* § 575 and comment b, pp. 185–187.

Damages for libel or slander *per se* included "harm caused thereby to the reputation of the person defamed or in the absence of proof of such harm, for the harm which normally results from such a defamation." *Id.,* § 621. At the heart of the libel-and-slander-*per-se*

---

[3] See also W. Prosser, *supra,* n. 1, § 112, p. 752 and n. 85; Murnaghan, From Figment to Fiction to Philosophy—The Requirement of Proof of Damages in Libel Actions, 22 Cath. U. L. Rev. 1, 11–13 (1972).

damage scheme lay the award of general damages for loss of reputation. They were granted without special proof because the judgment of history was that the content of the publication itself was so likely to cause injury and because "in many cases the effect of defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed." *Id.,* § 621, comment a, p. 314.[4] Proof of actual injury to reputation was itself insufficient proof of that special damage necessary to support liability for slander not actionable *per se.* But if special damage in the form of material or pecuniary loss were proved, general damages for injury to reputation could be had without further proof. "The plaintiff may recover not only for the special harm so caused, but also for general loss of reputation." *Id.,* § 575, comment a, p. 185.[5] The right to recover for emotional distress depended upon the defendant's otherwise being liable for either libel or slander. *Id.,* § 623. Punitive damages were recoverable upon proof of special facts amounting to express malice. *Id.,* § 908 and comment b, p. 555.

---

[4] Proof of the defamation itself established the fact of injury and the existence of some damage to the right of reputation, and the jury was permitted, even without any other evidence, to assess damages that were considered to be the natural or probable consequences of the defamatory words. Restatement of Torts § 621, comment a, p. 314 (1938); see also C. Gatley, Libel and Slander 1004 (6th ed. 1967); M. Newell, Slander and Libel § 721, p. 810 (4th ed. 1924); see generally C. McCormick, Law of Damages § 116, pp. 422–430 (1935). In this respect, therefore, the damages were presumed because of the impossibility of affixing an exact monetary amount for present and future injury to the plaintiff's reputation, wounded feelings and humiliation, loss of business, and any consequential physical illness or pain. *Ibid.*

[5] See also Prosser, *supra,* n. 1, § 112, p. 761; Harper & James, *supra,* n. 1, § 5.14, p. 388; Note, Developments in the Law—Defamation, 69 Harv. L. Rev. 875, 939–940 (1956).

Preparations in the mid-1960's for Restatement (Second) of Torts reflected what were deemed to be substantial changes in the law of defamation, primarily a trend toward limiting *per se* libels to those where the defamatory nature of the publication is apparent on its face, *i. e.,* where the "defamatory innuendo is apparent from the publication itself without reference to extrinsic facts by way of inducement." Restatement (Second) of Torts § 569, p. 29 (Tent. Draft No. 12, Apr. 27, 1966). Libels of this sort and slanders *per se* continued to be recognized as actionable without proof of special damage or injury to reputation.[6] All other defamations would require proof of special injury in the form of material or pecuniary loss. Whether this asserted change reflected the prevailing law was heavily debated,[7] but it was unquestioned at the time that there are recurring situations in which libel and slander are and should be actionable *per se.*

In surveying the current state of the law, the proposed Restatement (Second) observed that "[a]ll courts except Virginia agree that any libel which is defamatory upon its face is actionable without proof of damage . . . ." Restatement (Second) of Torts § 569, p. 84 (Tent. Draft No. 11, Apr. 15, 1965). Ten jurisdictions continued to support the old rule that libel not defamatory on its face and whose innuendo depends on extrinsic facts is actionable without proof of damage although slander would not be. Twenty-four jurisdictions were said to hold that libel not defamatory on its face is to be treated like slander and thus not actionable without proof of damage where

---

[6] Also actionable *per se* were those libels where the imputation, although not apparent from the material itself, would have been slander *per se* if spoken rather than written.

[7] Restatement (Second) of Torts § 569, pp. 29–45, 47–48 (Tent. Draft No. 12, Apr. 27, 1966); see also Murnaghan, *supra,* n. 3.

slander would not be. *Id.,* § 569, p. 86. The law in six jurisdictions was found to be in an unsettled state but most likely consistent with the Restatement (Second). *Id.,* § 569, p. 88. The law in Virginia was thought to consider libel actionable without proof of special damage only where slander would be, regardless of whether the libel is defamatory on its face. *Id.,* § 569, p. 89. All States, therefore, were at that time thought to recognize important categories of defamation that were actionable *per se.*[8] Nor was any question apparently raised at that time that upon proof of special damage in the form of material or pecuinary loss, general damages to reputation could be recovered without further proof.

Unquestionably, state law continued to recognize some absolute, as well as some conditional, privileges to publish defamatory materials, including the privilege of fair comment in defined situations. But it remained true that in a wide range of situations, the ordinary citizen could make out a prima facie case without proving more than a defamatory publication and could recover general damages for injury to his reputation unless defeated by the defense of truth.[9]

The impact of today's decision on the traditional law of libel is immediately obvious and indisputable. No longer will the plaintiff be able to rest his case with proof of a libel defamatory on its face or proof of a slander historically actionable *per se.* In addition, he must prove some further degree of culpable conduct on the part of the

---

[8] Applying settled Illinois law, the District Court in this case held that it is libel *per se* to label someone a Communist. 306 F. Supp. 310 (ND Ill. 1969).

[9] This appears to have been the law in Illinois at the time Gertz brought his libel suit. See, *e. g., Brewer* v. *Hearst Publishing Co.,* 185 F. 2d 846 (CA7 1950); *Hotz* v. *Alton Telegraph Printing Co.,* 324 Ill. App. 1, 57 N. E. 2d 137 (1944); *Cooper* v. *Illinois Publishing & Printing Co.,* 218 Ill. App. 95 (1920).

publisher, such as intentional or reckless falsehood or negligence. And if he succeeds in this respect, he faces still another obstacle: recovery for loss of reputation will be conditioned upon "competent" proof of actual injury to his standing in the community. This will be true regardless of the nature of the defamation and even though it is one of those particularly reprehensible statements that have traditionally made slanderous words actionable without proof of fault by the publisher or of the damaging impact of his publication. The Court rejects the judgment of experience that some publications are so inherently capable of injury, and actual injury so difficult to prove, that the risk of falsehood should be borne by the publisher, not the victim. Plainly, with the additional burden on the plaintiff of proving negligence or other fault, it will be exceedingly difficult, perhaps impossible, for him to vindicate his reputation interest by securing a judgment for nominal damages, the practical effect of such a judgment being a judicial declaration that the publication was indeed false. Under the new rule the plaintiff can lose, not because the statement is true, but because it was not negligently made.

So too, the requirement of proving special injury to reputation before general damages may be awarded will clearly eliminate the prevailing rule, worked out over a very long period of time, that, in the case of defamations not actionable *per se,* the recovery of general damages for injury to reputation may also be had if some form of material or pecuniary loss is proved. Finally, an inflexible federal standard is imposed for the award of punitive damages. No longer will it be enough to prove ill will and an attempt to injure.

These are radical changes in the law and severe invasions of the prerogatives of the States. They should

at least be shown to be required by the First Amendment or necessitated by our present circumstances. Neither has been demonstrated.

Of course, *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964); *Rosenblatt* v. *Baer*, 383 U. S. 75 (1966), and *Curtis Publishing Co.* v. *Butts* and *Associated Press* v. *Walker*, 388 U. S. 130 (1967), have themselves worked major changes in defamation law. Public officials and public figures, if they are to recover general damages for injury to reputation, must prove knowing falsehood or reckless disregard for the truth. The States were required to conform to these decisions. Thereafter in *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29 (1971), three Members of the Court urged that the same standard be applied whenever the publication concerned an event of public or general concern. But none of these cases purported to foreclose in all circumstances recovery by the ordinary citizen on traditional standards of liability, and until today, a majority of the Court had not supported the proposition that, given liability, a court or jury may not award general damages in a reasonable amount without further proof of injury.

In the brief period since *Rosenbloom* was decided, at least 17 States and several federal courts of appeals have felt obliged to consider the *New York Times* constitutional privilege for liability as extending to, in the words of the *Rosenbloom* plurality, "all discussion and communication involving matters of public or general concern." *Id.*, at 44.[10] Apparently, however, general

---

[10] See, *e. g.*, *West* v. *Northern Publishing Co.*, 487 P. 2d 1304, 1305–1306 (Alaska 1971) (article linking owners of taxicab companies to illegal liquor sales to minors); *Gallman* v. *Carnes*, 254 Ark. 987, 992, 497 S. W. 2d 47, 50 (1973) (matter concerning state law school professor and assistant dean); *Belli* v. *Curtis Publishing Co.*, 25 Cal. App. 3d 384, 102 Cal. Rptr. 122 (1972) (article concerning attorney

damages still remain recoverable once that standard of liability is satisfied. Except where public officials and public figures are concerned, the Court now repudi-

---

with national reputation); *Moriarty* v. *Lippe*, 162 Conn. 371, 378–379, 294 A. 2d 326, 330–331 (1972) (publication about certain police officers); *Firestone* v. *Time, Inc.*, 271 So. 2d 745, 750–751 (Fla. 1972) (divorce of prominent citizen not a matter of legitimate public concern); *State* v. *Snyder*, 277 So. 2d 660, 666–668 (La. 1973) (criminal defamation prosecution of a defeated mayoral candidate for statements made about another candidate); *Twohig* v. *Boston Herald-Traveler Corp.*, —— Mass. ——, ——, 291 N. E. 2d 398, 400–401 (1973) (article concerning a candidate's votes in the legislature); *Priestley* v. *Hastings & Sons Publishing Co. of Lynn*, 360 Mass. 118, 271 N. E. 2d 628 (1971) (article about an architect commissioned by a town to build a school); *Harnish* v. *Herald-Mail Co., Inc.*, 264 Md. 326, 334–336, 286 A. 2d 146, 151 (1972) (article concerning substandard rental property owned by a member of a city housing authority); *Standke* v. *B. E. Darby & Sons, Inc.*, 291 Minn. 468, 476–477, 193 N. W. 2d 139, 145 (1971) (newspaper editorial concerning performance of grand jurors); *Whitmore* v. *Kansas City Star Co.*, 499 S. W. 2d 45, 49 (Mo. Ct. App. 1973) (article concerning a juvenile officer, the operation of a detention home, and a grand jury investigation); *Trails West, Inc.* v. *Wolff*, 32 N. Y. 2d 207, 214–218, 298 N. E. 2d 52, 55–58 (1973) (suit against a Congressman for an investigation into the death of schoolchildren in a bus accident); *Twenty-five East 40th Street Restaurant Corp.* v. *Forbes, Inc.*, 30 N. Y. 2d 595, 282 N. E. 2d 118 (1972) (magazine article concerning a restaurant's food); *Kent* v. *City of Buffalo*, 29 N. Y. 2d 818, 277 N. E. 2d 669 (1971) (television station film of plaintiff as a captured robber); *Frink* v. *McEldowney*, 29 N. Y. 2d 720, 275 N. E. 2d 337 (1971) (article concerning an attorney representing a town); *Mead* v. *Horvitz Publishing Co.* (9th Dist. Ohio Ct. App. June 13, 1973) (unpublished), cert. denied, 416 U. S. 985 (1974) (financial condition of participants in the development of a large apartment complex involving numerous local contractors); *Washington* v. *World Publishing Co.*, 506 P. 2d 913 (Okla. 1973) (article about contract dispute between a candidate for United States Senate and his party's county chairman); *Matus* v. *Triangle Publications, Inc.*, 445 Pa. 384, 395–399, 286 A. 2d 357, 363–365 (1971)

ates the plurality opinion in *Rosenbloom* and appears to espouse the liability standard set forth by three other Justices in that case. The States must now struggle to

(radio "talk show" host's discussion of gross overcharging for snow-plowing a driveway not considered an event of public or general concern); *Autobuses Internacionales S. De R.L., Ltd.* v. *El Continental Publishing Co.*, 483 S. W. 2d 506 (Tex. Ct. Civ. App. 1972) (newspaper article concerning a bus company's raising of fares without notice and in violation of law); *Sanders* v. *Harris*, 213 Va. 369, 372–373, 192 S. E. 2d 754, 757–758 (1972) (article concerning English professor at a community college); *Old Dominion Branch No. 496* v. *Austin*, 213 Va. 377, 192 S. E. 2d 737 (1972), rev'd, *ante*, p. 264 (plaintiff's failure to join a labor union considered not an issue of public or general concern); *Chase* v. *Daily Record, Inc.*, 83 Wash. 2d 37, 41, 515 P. 2d 154, 156 (1973) (article concerning port district commissioner); *Miller* v. *Argus Publishing Co.*, 79 Wash. 2d 816, 827, 490 P. 2d 101, 109 (1971) (article concerning the backer of political candidates); *Polzin* v. *Helmbrecht*, 54 Wis. 2d 578, 586, 196 N. W. 2d 685, 690 (1972) (letter to editor of newspaper concerning a reporter and the financing of pollution control measures).

The following United States Courts of Appeals have adopted the plurality opinion in *Rosenbloom: Cantrell* v. *Forest City Publishing Co.*, 484 F. 2d 150 (CA6 1973), cert. pending, No. 73–5520 (article concerning family members of the victim of a highly publicized bridge disaster not actionable absent proof of actual malice); *Porter* v. *Guam Publications, Inc.*, 475 F. 2d 744, 745 (CA9 1973) (article concerning citizen's arrest for theft of a cash box considered an event of general or public interest); *Cervantes* v. *Time, Inc.*, 464 F. 2d 986, 991 (CA8 1972) (article concerning mayor and alleged organized crime connections conceded to be a matter of public or general concern); *Firestone* v. *Time, Inc.*, 460 F. 2d 712 (CA5 1972) (magazine article concerning prominent citizen's use of detectives and electronic surveillance in connection with a divorce); *Davis* v. *National Broadcasting Co.*, 447 F. 2d 981 (CA5 1971), aff'g 320 F. Supp. 1070 (ED La. 1970) (television report about a person caught up in the events surrounding the assassination of President Kennedy considered a matter of public interest). However, at least one Court of Appeals, faced with an appeal from summary judgment in favor of a publisher in a diversity libel suit brought by a Philadelphia retailer, has expressed "discom-

discern the meaning of such ill-defined concepts as "liability without fault" and to fashion novel rules for the recovery of damages. These matters have not been briefed or argued by the parties and their workability has not been seriously explored. Nevertheless, yielding to the apparently irresistible impulse to announce a new and different interpretation of the First Amendment, the Court discards history and precedent in its rush to refashion defamation law in accordance with the inclinations of a perhaps evanescent majority of the Justices.

## II

The Court does not contend, and it could hardly do so, that those who wrote the First Amendment intended to prohibit the Federal Government, within its sphere of influence in the Territories and the District of Columbia, from providing the private citizen a peaceful remedy for damaging falsehood. At the time of the adoption of the First Amendment, many of the consequences of libel law already described had developed, particularly the rule that libels and some slanders were so inherently injurious that they were actionable without special proof of damage to reputation. As the Court pointed out in *Roth* v. *United States,* 354 U. S. 476, 482 (1957), 10 of the 14 States that had ratified the Constitution by 1792 had themselves provided constitutional guarantees for free

fort in accepting the *Rosenbloom* plurality opinion as a definitive statement of the appropriate law . . . ." *Gordon* v. *Random House, Inc.,* 486 F. 2d 1356, 1359 (CA3 1973).

As previously discussed in n. 2, *supra,* the latest proposed draft of Restatement (Second) of Torts substantially reflects the views of the *Rosenbloom* plurality. It also anticipates "that the Supreme Court will hold that strict liability for defamation is inconsistent with the free-speech provision of the First Amendment . . . ," Restatement (Second) of Torts § 569, p. 59 (Tent. Draft No. 20, Apr. 25, 1974), as well as the demise of pre-*Rosenbloom* damages rules. See *id.,* § 621, pp. 285–288.

expression, and 13 of the 14 nevertheless provided for the prosecution of libels. Prior to the Revolution, the American Colonies had adopted the common law of libel.[11] Contrary to some popular notions, freedom of the press was sharply curtailed in colonial America.[12] Seditious libel was punished as a contempt by the colonial legislatures and as a criminal offense in the colonial courts.[13]

Scant, if any, evidence exists that the First Amendment was intended to abolish the common law of libel, at least to the extent of depriving ordinary citizens of meaningful redress against their defamers. On the contrary,

> "[i]t is conceded on all sides that the common-law rules that subjected the libeler to responsibility for the private injury, or the public scandal or disorder occasioned by his conduct, are not abolished by the protection extended to the press in our constitutions." 2 T. Cooley, Constitutional Limitations 883 (8th ed. 1927).

Moreover, consistent with the Blackstone formula,[14] these

---

[11] Merin, Libel and the Supreme Court, 11 Wm. & Mary L. Rev. 371, 373 (1969).

[12] A. Sutherland, Constitutionalism in America: Origin and Evolution of Its Fundamental Ideas 118–119 (1965).

[13] See generally L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History (1960).

[14] The men who wrote and adopted the First Amendment were steeped in the common-law tradition of England. They read Blackstone, "a classic tradition of the bar in the United States" and "the oracle of the common law in the minds of the American Framers . . . ." J. Hurst, The Growth of American Law: The Law Makers 257 (1950); Levy, supra, n. 13, at 13; see also Sutherland, supra, n. 12, at 124–125; Schick v. United States, 195 U. S. 65, 69 (1904). From him they learned that the major means of accomplishing free speech and press was to prevent prior restraints, the publisher later being subject to legal action if his publication was injurious. 4 W. Blackstone, Commentaries *150–153.

common-law actions did not abridge freedom of the press. See generally L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 247–248 (1960); Merin, Libel and the Supreme Court, 11 Wm. & Mary L. Rev. 371, 376 (1969); Hallen, Fair Comment, 8 Tex. L. Rev. 41, 56 (1929). Alexander Meiklejohn, who accorded generous reach to the First Amendment, nevertheless acknowledged:

> "No one can doubt that, in any well-governed society, the legislature has both the right and the duty to prohibit certain forms of speech. Libelous assertions may be, and must be, forbidden and punished. So too must slander. . . . All these necessities that speech be limited are recognized and provided for under the Constitution. They were not unknown to the writers of the First Amendment. That amendment, then, we may take it for granted, *does not forbid the abridging of speech.* But, at the same time, *it does forbid the abridging of the freedom of speech.* It is to the solving of that paradox, that apparent self-contradiction, that we are summoned if, as free men, we wish to know what the right of freedom of speech is." Political Freedom, The Constitutional Powers of the People 21 (1965).

See also Leflar, The Free-ness of Free Speech, 15 Vand. L. Rev. 1073, 1080–1081 (1962).

Professor Zechariah Chafee, a noted First Amendment scholar, has persuasively argued that conditions in 1791 "do not arbitrarily fix the division between lawful and unlawful speech for all time." Free Speech in the United States 14 (1954).[15] At the same time, however,

---

[15] See also Meiklejohn, The First Amendment Is An Absolute, 1961 Sup. Ct. Rev. 245, 264:

"First, the Framers initiated a political revolution whose development is still in process throughout the world. Second, like most

he notes that while the Framers may have intended to abolish seditious libels and to prevent any prosecutions by the Federal Government for criticism of the Government,[16] "the free speech clauses do not wipe out the common law as to obscenity, profanity, and defamation of individuals." [17]

The debates in Congress and the States over the Bill of Rights are unclear and inconclusive on any articulated intention of the Framers as to the free press guarantee.[18] We know that Benjamin Franklin, John Adams, and William Cushing favored limiting freedom of the press to truthful statements, while others such as James Wilson suggested a restatement of the Blackstone standard.[19]

revolutionaries, the Framers could not foresee the specific issues which would arise as their 'novel idea' exercised its domination over the governing activities of a rapidly developing nation in a rapidly and fundamentally changing world. In that sense, the Framers did not know what they were doing. And in the same sense, it is still true that, after two centuries of experience, we do not know what they were doing, or what we ourselves are now doing.

"In a more abstract and more significant sense, however, both they and we have been aware that the adoption of the principle of self-government by 'The People' of this nation set loose upon us and upon the world at large an idea which is still transforming men's conceptions of what they are and how they may best be governed."

[16] See Beauharnais v. Illinois, 343 U. S. 250, 272 (1952) (Black, J., dissenting). Brant, who interprets the Framers' intention more liberally than Chafee, nevertheless saw the free speech protection as bearing upon criticism of government and other political speech. I. Brant, The Bill of Rights 236 (1965).

[17] Z. Chafee, Free Speech in the United States 14 (1954).

[18] See 1 Annals of Cong. 729–789 (1789). See also Brant, supra, n. 16, at 224; Levy, supra, n. 13, at 214, 224.

[19] Merin, supra, n. 11, at 377. Franklin, for example, observed: "If by the Liberty of the Press were understood merely the Liberty of discussing the Propriety of Public Measures and political opinions, let us have as much of it as you please: But if it means the Liberty of affronting, calumniating, and defaming one another, I, for my

Jefferson endorsed Madison's formula that "Congress shall make no law . . . abridging the freedom of speech or the press" only after he suggested:

> "The people shall not be deprived of their right to speak, to write, or *otherwise* to publish anything but false facts affecting injuriously the life, liberty, or reputation of others . . . ." F. Mott, *Jefferson and the Press* 14 (1943).[20]

Doubt has been expressed that the Members of Congress envisioned the First Amendment as reaching even this far. Merin, Libel and the Supreme Court, 11 Wm. & Mary L. Rev. 371, § 379–380 (1969).

This Court in bygone years has repeatedly dealt with libel and slander actions from the District of Columbia and from the Territories. Although in these cases First Amendment considerations were not expressly discussed, the opinions of the Court unmistakably revealed that the classic law of libel was firmly in place in those areas where federal law controlled. See, *e. g., Washington Post Co.* v. *Chaloner,* 250 U. S. 290 (1919); *Baker* v. *Warner,* 231 U. S. 588 (1913); *Nalle* v. *Oyster,* 230 U. S. 165 (1913); *Dorr* v. *United States,* 195 U. S. 138 (1904); *Pollard* v. *Lyon,* 91 U. S. 225 (1876); *White* v. *Nicholls,* 3 How. 266 (1845).

The Court's consistent view prior to *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), was that defamatory

---

part, own myself willing to part with my Share of it when our Legislators shall please so to alter the Law, and shall cheerfully consent to exchange my *Liberty* of Abusing others for the *Privilege* of not being abus'd myself." 10 B. Franklin, Writings 38 (Smyth ed. 1907).

[20] Jefferson's noted opposition to public prosecutions for libel of government figures did not extend to depriving them of private libel actions. Mott, *supra,* at 43. There is even a strong suggestion that he favored state prosecutions. E. Hudon, Freedom of Speech and Press in America 47–48 (1963).

utterances were wholly unprotected by the First Amendment. In *Patterson* v. *Colorado ex rel. Attorney General*, 205 U. S. 454, 462 (1907), for example, the Court said that although freedom of speech and press is protected from abridgment by the Constitution, these provisions "do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare." This statement was repeated in *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 714 (1931), the Court adding:

> "But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common law rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our constitutions." *Id.*, at 715.

*Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942) (footnotes omitted), reflected the same view:

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

*Beauharnais* v. *Illinois*, 343 U. S. 250, 254–257 (1952) (footnotes omitted), repeated the *Chaplinsky* statement, noting also that nowhere at the time of the adoption of

the Constitution "was there any suggestion that the crime of libel be abolished." And in *Roth* v. *United States,* 354 U. S., at 483 (footnote omitted), the Court further examined the meaning of the First Amendment:

> "In light of this history, it is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous utterances are not within the area of constitutionally protected speech. *Beauharnais* v. *Illinois,* 343 U. S. 250, 266. At the time of the adoption of the First Amendment, obscenity law was not as fully developed as libel law, but there is sufficiently contemporaneous evidence to show that obscenity, too, was outside the protection intended for speech and press." [21]

The Court could not accept the generality of this historic view in *New York Times Co.* v. *Sullivan, supra.* There the Court held that the First Amendment was intended to forbid actions for seditious libel and that defamation actions by public officials were therefore not subject to the traditional law of libel and slander. If these officials (and, later, public figures occupying semi-official or influential, although private, positions) were to recover, they were required to prove not only that the publication was false but also that it was knowingly false or published with reckless disregard for its truth or falsity. This view that the First Amendment was written to for-

---

[21] For further expressions of the general proposition that libels are not protected by the First Amendment, see *Konigsberg* v. *State Bar of California,* 366 U. S. 36, 49–50 and n. 10 (1961); *Times Film Corp.* v. *City of Chicago,* 365 U. S. 43, 48 (1961); *Pennekamp* v. *Florida,* 328 U. S. 331, 348–349 (1946); cf. *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 67 (1973); *Stanley* v. *Georgia,* 394 U. S. 557, 561 n. 5 (1969).

bid seditious libel reflected one side of the dispute that raged at the turn of the nineteenth century [22] and also mirrored the views of some later scholars.[23]

The central meaning of *New York Times,* and for me the First Amendment as it relates to libel laws, is that seditious libel—criticism of government and public officials—falls beyond the police power of the State. 376 U. S., at 273–276.[24] In a democratic society such as ours, the citizen has the privilege of criticizing his government and its officials. But neither *New York Times* nor its progeny suggest that the First Amendment intended in all circumstances to deprive the private citizen of his historic recourse to redress published falsehoods damaging to reputation or that, contrary to history and precedent, the Amendment should now be so interpreted. Simply put, the First Amendment did not confer a "license to defame the citizen." W. Douglas, The Right of the People 36 (1958).

I do not labor the foregoing matters to contend that the Court is foreclosed from reconsidering prior interpretations of the First Amendment.[25] But the Court apparently finds a clean slate where in fact we have instructive historical experience dating from long before

[22] See Levy, *supra,* n. 13, at 247–248.

[23] See, *e. g., Abrams* v. *United States,* 250 U. S. 616, 630 (1919) (Holmes, J., dissenting).

[24] Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment," 1964 Sup. Ct. Rev. 191, 208–209.

[25] "The language of the First Amendment is to be read not as barren words found in a dictionary but as symbols of historic experience illumined by the presuppositions of those who employed them. . . . As in the case of every other provision of the Constitution that is not crystallized by the nature of its technical concepts, the fact that the First Amendment is not self-defining and self-enforcing neither impairs its usefulness nor compels its paralysis as a living instrument." *Dennis* v. *United States,* 341 U. S. 494, 523 (1951) (Frankfurter, J., concurring).

the first settlers, with their notions of democratic government and human freedom, journeyed to this land. Given this rich background of history and precedent and because we deal with fundamentals when we construe the First Amendment, we should proceed with care and be presented with more compelling reasons before we jettison the settled law of the States to an even more radical extent.[26]

## III

The Court concedes that the dangers of self-censorship are insufficient to override the state interest in protecting the reputation of private individuals who are both more helpless and more deserving of state concern than public persons with more access to the media to defend themselves. It therefore refuses to condition the private plaintiff's recovery on a showing of intentional or reckless falsehood as required by *New York Times*. But the Court nevertheless extends the reach of the First Amendment to all defamation actions by requiring that the ordinary

---

[26] "[T]he law of defamation has been an integral part of the laws of England, the colonies and the states since time immemorial. So many actions have been maintained and judgments recovered under the various laws of libel that the Constitutional validity of libel actions could be denied only by a Court willing to hold all of its predecessors were wrong in their interpretation of the First Amendment and that two hundred years of precedents should be overruled." Rutledge, The Law of Defamation: Recent Developments, 32 Alabama Lawyer 409, 410 (1971).

The prevailing common-law libel rules in this country have remained in England and the Commonwealth nations. Pedrick, Freedom of the Press and the Law of Libel: The Modern Revised Translation, 49 Cornell L. Q. 581, 583–584 (1964). After many years of reviewing the English law of defamation, the Porter Committee concluded that "though the law as to defamation requires some modification, the basic principles upon which it is founded are not amiss." Report of the Committee on the Law of Defamation, Cmd. No. 7536, ¶ 222, p. 48 (1948).

citizen, when libeled by a publication defamatory on its face, must prove some degree of culpability on the part of the publisher beyond the circulation to the public of a damaging falsehood. A rule at least as strict would be called for where the defamatory character of the publication is not apparent from its face. *Ante,* at 348.[27] Furthermore, if this major hurdle to establish liability is surmounted, the Court requires proof of actual injury to reputation before any damages for such injury may be awarded.

The Court proceeds as though it were writing on *tabula rasa* and suggests that it must mediate between two unacceptable choices—on the one hand, the rigors of the *New York Times* rule which the Court thinks would give insufficient recognition to the interest of the private plaintiff, and, on the other hand, the prospect of imposing "liability without fault" on the press and others who are charged with defamatory utterances. Totally ignoring history and settled First Amendment law, the Court purports to arrive at an "equitable compromise," rejecting both what it considers faultless liability and *New York Times* malice, but insisting on some intermediate degree of fault. Of course, the Court necessarily discards the contrary judgment arrived at in the 50 States that the reputation interest of the private citizen is deserving of considerably more protection.

The Court evinces a deep-seated antipathy to "liability without fault." But this catch-phrase has no talismanic significance and is almost meaningless in this context where the Court appears to be addressing those libels and slanders that are defamatory on their face and where

---

[27] If I read the Court correctly, it clearly implies that for those publications that do not make "substantial danger to reputation apparent," the *New York Times* actual-malice standard will apply. Apparently, this would be true even where the imputation concerned conduct or a condition that would be *per se* slander.

the publisher is no doubt aware from the nature of the material that it would be inherently damaging to reputation. He publishes notwithstanding, knowing that he will inflict injury. With this knowledge, he must intend to inflict that injury, his excuse being that he is privileged to do so—that he has published the truth. But as it turns out, what he has circulated to the public is a very damaging falsehood. Is he nevertheless "faultless"? Perhaps it can be said that the mistake about his defense was made in good faith, but the fact remains that it is he who launched the publication knowing that it could ruin a reputation.

In these circumstances, the law has heretofore put the risk of falsehood on the publisher where the victim is a private citizen and no grounds of special privilege are invoked. The Court would now shift this risk to the victim, even though he has done nothing to invite the calumny, is wholly innocent of fault, and is helpless to avoid his injury. I doubt that jurisprudential resistance to liability without fault is sufficient ground for employing the First Amendment to revolutionize the law of libel, and in my view, that body of legal rules poses no realistic threat to the press and its service to the public. The press today is vigorous and robust. To me, it is quite incredible to suggest that threats of libel suits from private citizens are causing the press to refrain from publishing the truth. I know of no hard facts to support that proposition, and the Court furnishes none.

The communications industry has increasingly become concentrated in a few powerful hands operating very lucrative businesses reaching across the Nation and into almost every home.[28] Neither the industry as a whole nor

---

[28] A recent study has comprehensively detailed the role and impact of mass communications in this Nation. See Note, Media and the First Amendment in a Free Society, 60 Geo. L. J. 867 (1972). For example, 99% of the American households have a radio, and 77%

its individual components are easily intimidated, and we are fortunate that they are not. Requiring them to pay for the occasional damage they do to private reputation will play no substantial part in their future performance or their existence.

In any event, if the Court's principal concern is to protect the communications industry from large libel judgments, it would appear that its new requirements with respect to general and punitive damages would be ample protection. Why it also feels compelled to escalate the threshold standard of liability I cannot fathom,

---

hear at least one radio newscast daily. In 1970, the yearly average home television viewing time was almost six hours per day. *Id.,* at 883 n. 53.

"Sixty years ago, 2,442 newspapers were published daily nationwide, and 689 cities had competing dailies. Today, in only 42 of the cities served by one of the 1,748 American daily papers is there a competing newspaper under separate ownership. Total daily circulation has passed 62 million copies, but over 40 percent of this circulation is controlled by only 25 ownership groups.

"Newspaper owners have profited greatly from the consolidation of the journalism industry. Several of them report yearly profits in the tens of millions of dollars, with after tax profits ranging from seven to 14 percent of gross revenues. Unfortunately, the owners have made their profits at the expense of the public interest in free expression. As the broad base of newspaper ownership narrows, the variation of facts and opinions received by the public from antagonistic sources is increasingly limited. Newspaper publication is indeed a leading American industry. Through its evolution in this direction, the press has come to be dominated by a select group whose prime interest is economic.

"The effect of consolidation within the newspaper industry is magnified by the degree of intermedia ownership. Sixty-eight cities have a radio station owned by the only local daily newspaper, and 160 television stations have newspaper affiliations. In 11 cities diversity of ownership is completely lacking with the only television station and newspaper under the same control." *Id.,* at 892–893 (footnotes omitted).

See also Congress, FCC Consider Newspaper Control of Local TV, 32 Cong. Q. 659–663 (1974).

particularly when this will eliminate in many instances the plaintiff's possibility of securing a judicial determination that the damaging publication was indeed false, whether or not he is entitled to recover money damages. Under the Court's new rules, the plaintiff must prove not only the defamatory statement but also some degree of fault accompanying it. The publication may be wholly false and the wrong to him unjustified, but his case will nevertheless be dismissed for failure to prove negligence or other fault on the part of the publisher. I find it unacceptable to distribute the risk in this manner and force the wholly innocent victim to bear the injury; for, as between the two, the defamer is the only culpable party. It is he who circulated a falsehood that he was not required to publish.

It is difficult for me to understand why the ordinary citizen should himself carry the risk of damage and suffer the injury in order to vindicate First Amendment values by protecting the press and others from liability for circulating false information. This is particularly true because such statements serve no purpose whatsoever in furthering the public interest or the search for truth but, on the contrary, may frustrate that search and at the same time inflict great injury on the defenseless individual. The owners of the press and the stockholders of the communications enterprises can much better bear the burden. And if they cannot, the public at large should somehow pay for what is essentially a public benefit derived at private expense.

## IV

### A

Not content with escalating the threshold requirements of establishing liability, the Court abolishes the ordinary damages rule, undisturbed by *New York Times*

and later cases, that, as to libels or slanders defamatory on their face, injury to reputation is presumed and general damages may be awarded along with whatever special damages may be sought. Apparently because the Court feels that in some unspecified and unknown number of cases, plaintiffs recover where they have suffered no injury or recover more than they deserve, it dismisses this rule as an "oddity of tort law." The Court thereby refuses in *any* case to accept the fact of wide dissemination of a *per se* libel as prima facie proof of injury sufficient to survive a motion to dismiss at the close of plaintiff's case.

I have said before, but it bears repeating, that even if the plaintiff should recover no monetary damages, he should be able to prevail and have a judgment that the publication is false. But beyond that, courts and legislatures literally for centuries have thought that in the generality of cases, libeled plaintiffs will be seriously shortchanged if they must prove the extent of the injury to their reputations. Even where libels or slanders are not on their face defamatory and special damage must be shown, when that showing is made, general damages for reputation injury are recoverable without specific proof.[29]

---

[29] Having held that the defamation plaintiff is limited to recovering for "actual injury," the Court hastens to add:

"Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Ante,* at 350.

It should be pointed out that under the prevailing law, where the defamation is not actionable *per se* and proof of "special damage" is required, a showing of actual injury to reputation is insufficient; but if pecuniary loss is shown, general reputation damages are recoverable. The Court changes the latter, but not the former, rule. Also under present law, pain and suffering, although shown, do not

The Court is clearly right when at one point it states that "the law of defamation is rooted in our experience that the truth rarely catches up with a lie." *Ante,* at 344 n. 9. But it ignores what that experience teaches, *viz.,* that damage to reputation is recurringly difficult to prove and that requiring actual proof would repeatedly destroy any chance for adequate compensation. Eminent authority has warned that

> "it is clear that proof of actual damage will be impossible in a great many cases where, from the character of the defamatory words and the circumstances of publication, it is all but certain that serious harm has resulted in fact." W. Prosser, Law of Torts § 112, p. 765 (4th ed. 1971).[30]

The Court fears uncontrolled awards of damages by juries, but that not only denigrates the good sense of most jurors—it fails to consider the role of trial and appellate courts in limiting excessive jury verdicts where no reasonable relationship exists between the amount awarded and the injury sustained.[31] Available informa-

---

warrant damages in any defamation action unless the plaintiff is otherwise entitled to at least nominal damages. By imposing a more difficult standard of liability and requiring proof of actual damage to reputation, recovery for pain and suffering, though real, becomes a much more remote possibility.

[30] "The harm resulting from an injury to reputation is difficult to demonstrate both because it may involve subtle differences in the conduct of the recipients toward the plaintiff and because the recipients, the only witnesses able to establish the necessary causal connection, may be reluctant to testify that the publication affected their relationships with the plaintiff. Thus some presumptions are necessary if the plaintiff is to be adequately compensated." Note, Developments in the Law—Defamation, 69 Harv. L. Rev. 875, 891–892 (1956).

[31] "On questions of damages, the judge plays an important role. It is, of course, for him to determine and instruct the jury as to what matters may be taken into consideration by them in arriving

tion tends to confirm that American courts have ably discharged this responsibility.[32]

The new rule with respect to general damages appears to apply to all libels or slanders, whether defamatory on their face or not, except, I gather, when the plaintiff proves intentional falsehood or reckless disregard. Although the impact of the publication on the victim is the same, in such circumstances the injury to reputation may apparently be presumed in accordance with the traditional rule. Why a defamatory statement is more apt to cause injury if the lie is intentional than when it is only negligent, I fail to understand. I suggest that judges and juries who must live by these rules will find them equally incomprehensible.

## B

With a flourish of the pen, the Court also discards the prevailing rule in libel and slander actions that punitive damages may be awarded on the classic grounds of common-law malice, that is, " '[a]ctual malice' in the sense of ill will or fraud or reckless indifference to con-

---

at a verdict since such questions are clearly matters of substantive law. But the judge also may and frequently does exercise a judgment as to the amount of damages the plaintiff may recover. His function here is primarily to keep the jury within bounds of reason and common sense, to guard against excessive verdicts dictated by passion and prejudice and to see to it that the amount of the verdict has some reasonable relation to the plaintiff's evidence as to his loss or the probability of loss. Thus, the trial judge may grant a new trial or the appellate court may reverse and remand the case for a new trial because of excessive damages or, as is more frequently the case, a remittitur may be ordered, the effect of which is that the plaintiff must accept a specified reduction of his damages or submit to a new trial on the issue of liability as well as damages." 1 F. Harper & F. James, The Law of Torts § 5.29, p. 467 (1956) (footnote omitted).

[32] See Pedrick, *supra,* n. 26, at 587 n. 23.

sequences." C. McCormick, Law of Damages § 118, p. 431 (1935); see also W. Prosser, *supra,* § 113, p. 772; 1 A. Hanson, Libel and Related Torts ¶ 163, p. 133 (1969); Note, Developments in the Law—Defamation, 69 Harv. L. Rev. 875, 938 (1956); Cal. Civ. Code § 48a (4)(d) (1954). In its stead, the Court requires defamation plaintiffs to show intentional falsehood or reckless disregard for the truth or falsity of the publication. The Court again complains about substantial verdicts and the possibility of press self-censorship, saying that punitive damages are merely "private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Ante,* at 350. But I see no constitutional difference between publishing with reckless disregard for the truth, where punitive damages will be permitted, and negligent publication where they will not be allowed. It is difficult to understand what is constitutionally wrong with assessing punitive damages to deter a publisher from departing from those standards of care ordinarily followed in the publishing industry, particularly if common-law malice is also shown.

I note also the questionable premise that "juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused." *Ibid.* This represents an inaccurate view of established practice, "another of those situations in which judges, largely unfamiliar with the relatively rare actions for defamation, rely on words without really going behind them . . . ." [33] While a jury award in any type of civil case may certainly be unpredictable, trial and appellate courts have been increasingly vigilant in ensuring that the jury's result is "based upon a rational consideration of the evidence and the proper application of the

[33] Murnaghan, *supra,* n. 3, at 29.

law." *Reynolds* v. *Pegler*, 123 F. Supp. 36, 39 (SDNY 1954), aff'd, 223 F. 2d 429 (CA2), cert. denied, 350 U. S. 846 (1955). See *supra,* nn. 31–32. Moreover, some courts require that punitive damages bear a reasonable relation to the compensatory damages award.[34] Still others bar common-law punitive damages or condition their award on a refusal to print a retraction.[35]

> "The danger . . . of immoderate verdicts, is certainly a real one, and the criterion to be applied by the judge in setting or reducing the amount is concededly a vague and subjective one. Nevertheless the verdict may be twice submitted by the complaining defendant to the common sense of trained judicial minds, once on motion for new trial and again on appeal, and it must be a rare instance when an unjustifiable award escapes correction." C. McCormick, *supra,* § 77, p. 278.

The Court points to absolutely no empirical evidence to substantiate its premise. For my part, I would require something more substantial than an undifferentiated fear of unduly burdensome punitive damages awards before retooling the established common-law rule and depriving the States of the opportunity to experiment with different methods for guarding against abuses.

Even assuming the possibility that some verdicts will be "excessive," I cannot subscribe to the Court's remedy. On its face it is a classic example of judicial overkill. Apparently abandoning the salutary *New York Times* policy of case-by-case " 'independent examination of the whole record' . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on

---

[34] Note, Developments in the Law—Defamation, 69 Harv. L. Rev., *supra,* at 875, 938 and n. 443.

[35] *Id.,* at 939, 941–942. See, *e. g.,* Cal. Civ. Code § 48a (2) (1954).

the field of free expression,"[36] the Court substitutes an inflexible rule barring recovery of punitive damages absent proof of constitutional malice. The First Amendment is a majestic statement of a free people's dedication to "uninhibited, robust, and wide-open" debate on public issues,[37] but we do it a grave disservice when we needlessly spend its force.[38] For almost 200 years, punitive damages and the First Amendment have peacefully coexisted. There has been no demonstration that state libel laws as they relate to punitive damages necessitate the majority's extreme response. I fear that those who read the Court's decision will find its words inaudible, for the Court speaks "only [with] a voice of power, not of reason." *Mapp* v. *Ohio,* 367 U. S. 643, 686 (1961) (Harlan, J., dissenting).

V

In disagreeing with the Court on the First Amendment's reach in the area of state libel laws protecting nonpublic persons, I do not repudiate the principle that the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Associated Press* v. *United States,* 326 U. S. 1, 20 (1945); see also *Miami Herald Publishing Co.* v. *Tornillo, ante,* at 260 (WHITE, J., concurring). I continue to subscribe to the *New York Times* decision and those decisions extending its protection to defamatory falsehoods about public persons. My quarrel with the Court stems

[36] 376 U. S., at 285.

[37] *Id.,* at 270.

[38] Judicial review of jury libel awards for excessiveness should be influenced by First Amendment considerations, but it makes little sense to discard an otherwise useful and time-tested rule because it might be misapplied in a few cases.

from its willingness "to sacrifice good sense to a syllogism" [39]—to find in the *New York Times* doctrine an infinite elasticity. Unfortunately, this expansion is the latest manifestation of the destructive potential of any good idea carried out to its logical extreme.

Recovery under common-law standards for defamatory falsehoods about a private individual, who enjoys no "general fame or notoriety in the community," who is not "pervasive[ly] involve[d] in the affairs of society," and who does not "thrust himself into the vortex of [a given] public issue . . . in an attempt to influence its outcome," [40] is simply not forbidden by the First Amendment. A distinguished private study group put it this way:

> "Accountability, like subjection to law, is not necessarily a net subtraction from liberty." "The First Amendment was intended to guarantee free expression, not to create a privileged industry." Commission on Freedom of the Press, A Free and Responsible Press 130, 81 (1947).

I fail to see how the quality or quantity of public debate will be promoted by further emasculation of state libel laws for the benefit of the news media.[41] If any-

---

[39] O. Holmes, The Common Law 36 (1881).

[40] *Ante,* at 351, 352.

[41] Cf. Pedrick, *supra,* n. 26, at 601–602:

"A great many forces in our society operate to determine the extent to which men are free in fact to express their ideas. Whether there is a privilege for good faith defamatory misstatements on matters of public concern or whether there is strict liability for such statements may not greatly affect the course of public discussion. How different has life been in those states which heretofore followed the majority rule imposing strict liability for misstatements of fact defaming public figures from life in the minority states where the good faith privilege held sway?"

See also T. Emerson, The System of Freedom of Expression 519 (1970) (footnote omitted): "[O]n the whole the role of libel law in

thing, this trend may provoke a new and radical imbalance in the communications process. Cf. Barron, Access to the Press—A New First Amendment Right, 80 Harv. L. Rev. 1641, 1657 (1967). It is not at all inconceivable that virtually unrestrained defamatory remarks about private citizens will discourage them from speaking out and concerning themselves with social problems. This would turn the First Amendment on its head. Note, The Scope of First Amendment Protection for Good-Faith Defamatory Error, 75 Yale L. J. 642, 649 (1966); Merin, 11 Wm. & Mary L. Rev., at 418. David Riesman, writing in the midst of World War II on the fascists' effective use of defamatory attacks on their opponents, commented: "Thus it is that the law of libel, with its ecclesiastic background and domestic character, its aura of heart-balm suits and crusading nineteenth-century editors, becomes suddenly important for modern democratic survival." Democracy and Defamation: Fair Game and Fair Comment I, 42 Col. L. Rev. 1085, 1088 (1942).

This case ultimately comes down to the importance the Court attaches to society's "pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt* v. *Baer*, 383 U. S., at 86. From all that I have seen, the Court has miscalculated and denigrates that interest at a time when escalating assaults on individuality and personal dignity counsel otherwise.[42]

---

the system of freedom of expression has been relatively minor and essentially erratic."

[42] "The man who is compelled to live every minute of his life among others and whose every need, thought, desire, fancy or gratification is subject to public scrutiny, has been deprived of his individuality and human dignity. Such an individual merges with the mass. His opinions, being public, tend never to be different; his aspirations, being known, tend always to be conventionally accepted ones; his feelings, being openly exhibited, tend to lose their

At the very least, the issue is highly debatable, and the Court has not carried its heavy burden of proof to justify tampering with state libel laws.[43]

quality of unique personal warmth and to become the feelings of every man. Such a being, although sentient, is fungible; he is not an individual." Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N. Y. U. L. Rev. 962, 1003 (1964).

[43] With the evisceration of the common-law libel remedy for the private citizen, the Court removes from his legal arsenal the most effective weapon to combat assault on personal reputation by the press establishment. The David and Goliath nature of this relationship is all the more accentuated by the Court's holding today in *Miami Herald Publishing Co.* v. *Tornillo, ante,* p. 241, which I have joined, that an individual criticized by a newspaper's editorial is precluded by the First Amendment from requiring that newspaper to print his reply to that attack. While that case involves an announced candidate for public office, the Court's finding of a First Amendment barrier to government "intrusion into the function of editors," *ante,* at 258, does not rest on any distinction between private citizens or public officials. In fact, the Court observes that the First Amendment clearly protects from governmental restraint "the exercise of editorial control and judgment," *i. e.,* "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of *public issues and public officials*—whether fair or unfair . . . ." *Ibid.* (Emphasis added.)

We must, therefore, assume that the hapless ordinary citizen libeled by the press (a) may not enjoin in advance of publication a story about him, regardless of how libelous it may be, *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931); (b) may not compel the newspaper to print his reply; and (c) may not force the newspaper to print a retraction, because a judicially compelled retraction, like a "remedy such as an enforceable right of access," entails "governmental coercion" as to content, which "at once brings about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years." *Miami Herald Publishing Co.* v. *Tornillo, ante,* at 254; but cf. this case, *ante,* at 368 n. 3 (BRENNAN, J., dissenting).

My Brother BRENNAN also suggests that there may constitutionally be room for "the possible enactment of statutes, not requiring proof

While some risk of exposure "is a concomitant of life in a civilized community," *Time, Inc.* v. *Hill,* 385 U. S. 374, 388 (1967), the private citizen does not bargain for defamatory falsehoods. Nor is society powerless to vindicate unfair injury to his reputation.

> "It is a fallacy . . . to assume that the First Amendment is the only guidepost in the area of state defamation laws. It is not. . . .
>
> "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being— a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." *Rosenblatt* v. *Baer, supra,* at 92 (STEWART, J., concurring).

The case against razing state libel laws is compelling when considered in light of the increasingly prominent role of mass media in our society and the awesome power it has placed in the hands of a select few.[44] Surely, our political "system cannot flourish if regimentation takes hold." *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 469 (1952) (DOUGLAS, J., dissenting). Nor can it survive if our people are deprived of an effective method

---

of fault, which provide . . . for publication of a court's determination of falsity if the plaintiff is able to demonstrate that false statements have been published concerning his activities." *Ibid.* The Court, however, does not even consider this less drastic alternative to its new "some fault" libel standards.

[44] See n. 28, *supra.*

of vindicating their legitimate interest in their good names.[45]

Freedom and human dignity and decency are not antithetical. Indeed, they cannot survive without each other. Both exist side-by-side in precarious balance, one always threatening to overwhelm the other. Our experience as a Nation testifies to the ability of our democratic institutions to harness this dynamic tension. One of the mechanisms seized upon by the common law to accommodate these forces was the civil libel action tried before a jury of average citizens. And it has essentially fulfilled its role. Not because it is necessarily the best or only answer, but because

> "the juristic philosophy of the common law is at bottom the philosophy of pragmatism. Its truth is relative, not absolute. The rule that functions well produces a title deed to recognition." B. Cardozo, Selected Writings 149 (Hall ed. 1947).

In our federal system, there must be room for allowing the States to take diverse approaches to these vexing questions. We should "continue to forbear from fettering the States with an adamant rule which may embarrass them in coping with their own peculiar problems . . . ." *Mapp* v. *Ohio*, 367 U. S., at 681 (Harlan, J., dissenting); see also Murnaghan, From Figment to Fiction to Philosophy—The Requirement of Proof of Damages in Libel Actions, 22 Cath. U. L. Rev. 1, 38 (1972).

---

[45] "No democracy, . . . certainly not the American democracy, will indefinitely tolerate concentrations of private power irresponsible and strong enough to thwart the aspirations of the people. Eventually governmental power will be used to break up private power, or governmental power will be used to regulate private power— if private power is at once great and irresponsible." Commission on Freedom of the Press, A Free and Responsible Press 80 (1947).

Cf. *Younger* v. *Harris,* 401 U. S. 37, 44–45 (1971). Whether or not the course followed by the majority is wise, and I have indicated my doubts that it is, our constitutional scheme compels a proper respect for the role of the States in acquitting their duty to obey the Constitution. Finding no evidence that they have shirked this responsibility, particularly when the law of defamation is even now in transition, I would await some demonstration of the diminution of freedom of expression before acting.

For the foregoing reasons, I would reverse the judgment of the Court of Appeals and reinstate the jury's verdict.